Filed 6/7/17

CERTIFIED FOR PARTIAL PUBLICATION[*]

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| NANCY BRENNER, Individually and as Executor, etc., et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> UNIVERSAL HEALTH SERVICES OF RANCHO SPRINGS, INC., et al., <br><br> Defendants and Respondents. | D071094 <br><br><br> (Super. Ct. No. MCC 1300776) |

APPEAL from judgments of the Superior Court of Riverside County,

Sharon J. Waters, Judge.  Affirmed.

Bohm Law Group, Lawrance A. Bohm, Bradley J. Mancusco and Maria E.

Minney for Plaintiffs and Appellants.

Dummit, Buchholz & Trapp, Scott D. Buchholz and Moira S. Brennan for

Defendant and Respondent Universal Health Services of Rancho Springs, Inc.

Schmid & Voiles, Denise H. Greer, Sidney J. Martin and Michael C. Ting for

Defendant and Respondent Young H. Lee., M.D.

---

[*]      Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts III.A.2, III.A.4 and III.B.

# I.

## INTRODUCTION

Plaintiffs Nancy Brenner, individually and in her representative capacity as representative of the estate of Dale Brenner, and Zach Brenner, individually,[1] appeal judgments entered in favor of defendants Universal Health Services of Rancho Springs, Inc., doing business as Southwest Healthcare System - Inland Valley Medical Center (UHS) and Dr. Young H. Lee, M.D. (Dr. Lee or Lee).

Dale Brenner, Nancy's husband and Zach's father, was a patient at the Inland Valley Medical Center for approximately 23 days after he suffered a stroke a few hours after arriving at the emergency department of the hospital. He was eventually transferred to another medical facility, where he later died. Approximately a year after Dale Brenner's death, the plaintiffs sued UHS, Lee, and additional defendants, asserting causes of action for wrongful death based on medical negligence; retaliation, in violation of Health and Safety Code section 1278.5; and elder abuse, in violation of Welfare and Institutions Code sections 15610, et seq. Lee and UHS moved for summary judgment, which the trial court granted. The trial court thereafter entered judgments in favor of UHS and Lee.

On appeal, the plaintiffs contend that the trial court erroneously granted summary judgment in favor of UHS and Lee. We affirm the court's judgments.

---

[1]    When referring to the plaintiffs individually, we refer to them by their first names for purposes of clarity. We intend no disrespect.

II.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Factual background*

On May 31, 2012, Dale Brenner (Brenner), who was 71 years old at the time, was brought to the emergency department at the Inland Valley Medical Center, accompanied by his wife, Nancy, who had been a nurse for over 30 years. Brenner was complaining about severe shortness of breath, and his blood pressure upon admission to the facility was 198/100. Brenner's medical history included diagnoses of a previous heart attack, cardiac disease, insulin dependent diabetes, chronic obstructive pulmonary disease, a previous stroke (2007), high cholesterol, hypertension, sleep apnea, renal insufficiency, deep venous thrombosis requiring anti-coagulation medication, and congestive heart failure, as well as two coronary artery bypass graft surgeries (1990 and 1991) and a tracheostomy (2007).

Several hours after Brenner arrived at the emergency department, he suffered a stroke. He was thereafter admitted to the hospital's Intensive Care Unit (ICU). Brenner was placed on tube feedings and bi-level positive airway pressure (BiPAP).

On June 3, 2012, Nancy attempted to reach the Director of Nursing and the CEO of the hospital to express her concerns regarding the sufficiency of Brenner's care in the ICU. She also contacted the hospital's case manager office to complain.

Brenner's condition began to improve, and on June 4, 2012, he was transferred to the Progressive Care Unit (PCU), which provides a lower level of care than the ICU. That same day, Nancy made a request at the nurse's station to speak to the nursing

3

supervisor regarding Brenner's positioning and feeding tube issues that had occurred during the transfer process. The following day, Nancy left messages with a physician, who she contends failed to return her calls. She also asked to speak with the nursing supervisor that evening.

Brenner was transferred back to the ICU on June 7, 2012. Dr. Timothy Killeen informed Nancy that Brenner was in septic shock and was demonstrating signs of kidney failure.

On June 9, Dr. Lee, who specializes in critical care and pulmonology, first saw Brenner. Lee was covering for Dr. Killeen over the weekend. Dr. Lee noted that Brenner was in no acute distress and that his vital signs were stable. By June 10, at approximately noon, however, Dr. Lee noted that Brenner's condition had "significantly deteriorated." Brenner was short of breath and more "obtunded" (i.e., less alert). Brenner required continuous BiPAP. Dr. Lee planned to intubate Brenner. Dr. Lee's notes include the fact that he had been informed by Nancy that Brenner had a history of prior difficult intubation and had previously undergone an "emergent cricothyroidotomy." Dr. Lee requested an anesthesiologist to assist with the intubation.

An anesthesiologist arrived to perform the intubation, but encountered difficulty in performing the procedure. A surgeon arrived to perform a possible emergency tracheostomy. Nancy refused to leave the room, even after having been asked to do so multiple times and being told that a sterile environment was required. The anesthesiologist was ultimately able to successfully intubate Brenner. He noted that he believed Brenner may have aspirated prior to intubation.

4

Later that afternoon, Brenner's diastolic blood pressure dropped. Dr. Lee ordered that a "PICC" line be placed in order to administer medication to regulate Brenner's blood pressure. After a radiologist unsuccessfully attempted to place a "PICC" line in Brenner's arm, a central line was recommended instead. At approximately 3:30 p.m., Dr. Lee began a procedure to insert a central line into Brenner's right internal jugular vein.

According to Nancy, she asked Dr. Lee why he was not using an ultrasound to determine the appropriate placement of the central line. Dr. Lee replied that it was " 'not necessary.' " He refused to perform the procedure unless Nancy waited outside of the room. Nancy left the room. Approximately 30 minutes into the procedure, Nancy asked a nurse whether something had gone wrong. She was told that there had been some problems during the procedure but that everything was fine.

According to the nursing notes, Nancy was permitted back in Brenner's room at approximately 3:50 p.m. There was a dressing over the site of the central line insertion. No bleeding was indicated from the dressing. According to Nancy, when she returned to the room, there was blood all over the bedding and she saw the beginning signs of bruising and swelling around Brenner's neck.

The following morning, June 11, a nurse noticed a lump on Brenner's neck, and she checked the central line insertion site. The nurse noted the presence of a hematoma. She paged Dr. Lee. Dr. Lee then ordered a chest x-ray, which demonstrated that the right central line catheter was located in the superior vena cava, which, according to an expert, was the "appropriate position," and that Brenner had not suffered a pneumothorax (i.e., a punctured lung).

5

Later that morning, a nurse informed Lee that Brenner's hematoma appeared to be increasing in size.  Lee told the nurse to put a pressure dressing over it.  The nurse also told Lee that Nancy wanted to speak with him.  He informed the nurse that he was no longer on call for Dr. Killeen.  The nurse called Dr. Killeen, who told the nurse that he would call Nancy as soon as he could.

Also on June 11, 2012, a vascular surgeon evaluated Brennan's neck hematoma.  A CT scan of the area showed the existence of a soft tissue hematoma along the sternocleidomastoid muscle.  The CT scan demonstrated that the hematoma had no demonstrable effect on the carotid arteries and showed no indication that the carotid artery had been injured.  The surgeon believed that any active bleeding in the area had stopped, and noted that he would consider operating to drain the hematoma if it continued to grow or began to impose pressure on Brenner's airway.

Brenner was treated by Dr. Killeen for another 11 days.  At some point, Nancy requested that Brenner be transferred to Scripps Green Hospital.  He was transferred there on June 22, 2012.

Prior to Brenner's transfer to Scripps Green Hospital, during the final week he remained at Inland Valley Medical Center, Nancy met with the hospital's CEO and others regarding her concerns about Brenner's medical treatment.

After the transfer to Scripps Green Hospital, a cardiothoracic surgeon evaluated Brenner for a potential tracheostomy, given Brenner's respiratory failure due to severe pulmonary disease.  Without a tracheostomy, Brenner was facing the potential of being intubated for a prolonged period.  Later, however, the surgeon noted that if Brenner's

6

family wanted him to undergo aggressive care, he would have to be evaluated for laser therapy at UCSD for treatment of subglottic stenosis (narrowing of the windpipe) before a tracheostomy could be performed.

An MRI revealed that a significant portion of Brenner's brain tissue had died. Any surgical intervention as to an occlusion in his left carotid artery, even if successful, would not have provided Brenner with a decent quality of life. Brenner's treating physicians recommended to Nancy and Zach that they remove Brenner from life support. They agreed to do so and to have Brenner transferred to hospice care. Brenner died on June 29, 2012. Brenner's death certificate identifies "ACUTE RESPIRATORY FAILURE" as the primary cause of death. The death certificate also lists as contributing causes "NON TRAUMATIC RIGHT NECK HEMATOMA" and "CEREBROVASCULAR ACCIDENT."

B. *Procedural background*

Approximately a year after Brenner died, the plaintiffs filed a complaint against UHS, Lee, Dr. Nizar Salek, and Dr. Timothy Killeen.[2] In the original complaint, the plaintiffs asserted causes of action for (1) elder abuse, in violation of Welfare and Institutions Code section 15610, et seq., as to all defendants; (2) retaliation, in violation of Health and Safety Code section 1278.5, as to all defendants; and (3) "[w]rongful [d]eath/[m]edical [n]egligence," as to all defendants. In response to a demurrer filed by

---

[2]     Drs. Salek and Killeen are not parties to this appeal.

Lee, the plaintiffs amended the complaint to allege the same causes of action, but to limit the elder abuse claim to UHS, alone.

Lee filed a second demurrer and a motion to strike the plaintiffs' requests for predeath pain and suffering and punitive damages. UHS also moved to strike the request for punitive damages from the first amended complaint. The trial court overruled Lee's second demurrer, but struck from the complaint the plaintiffs' request for damages in the form of predeath pain and suffering, as well as the request for punitive damages.

The plaintiffs filed a motion for leave to file a second amended complaint in order to add a request for punitive damages, pursuant to Code of Civil Procedure section 425.13.

In late January, 2015, during the time period during which the parties were briefing the plaintiffs' motion for leave to file a second amended complaint, Lee filed a motion for summary judgment. The same day, UHS filed a motion for summary judgment. The motions were set for separate hearings to occur in mid-to-late April 2015.

On March 16, 2015, the court entered an order denying the motion for leave to amend to add a request for punitive damages.

The court held a hearing on Lee's motion for summary judgment in April 2015. The trial court overruled all of the plaintiffs' evidentiary objections. The trial court concluded that summary adjudication in favor of Lee was appropriate with respect to the retaliation claim. The court also determined that the plaintiffs' expert's declaration was legally insufficient to establish a triable issue of material fact with respect to causation as to the wrongful death claim. In addition, the court concluded that Lee was entitled to

8

summary adjudication with respect to the claim for retaliation under Health and Safety Code section 1278.5.

The court held a hearing on UHS's motion for summary judgment the following week. The court overruled all of the parties' evidentiary objections, and then turned to the merits of the summary judgment motion. The court took the matter under submission at the conclusion of the hearing and ultimately granted the motion in full.

The trial court entered judgment in favor of Lee on May 29, 2015. The trial court entered judgment in favor of UHS on June 5, 2015.

On September 4, 2015, the Court of Appeal, Fourth District, Division Two, entered an order deeming Nancy's premature notice of appeal to have been a notice of appeal filed following the entry of judgments. The court also construed the notice to include Zach, individually, as an appellant and to indicate Nancy's status in appealing both as an individual, as well as in her representative capacity as representative of Brenner's estate. The case was subsequently transferred to the Court of Appeal, Fourth District, Division One on September 13, 2016, per an order of the Supreme Court.[3]

---

[3] On June 10, 2016, the plaintiffs filed a request for judicial notice in which they request that this court take judicial notice of three reporter's transcripts from additional hearings that took place in the trial court:

> (1) The reporter's transcript from an October 7, 2013 hearing on Lee's demurrer and motion to strike; (2) The reporter's transcript from a November 24, 2014 trial setting conference; and (3) The reporter's transcript from a March 6, 2015 hearing on the plaintiffs' motion for leave to file second amended complaint to plead punitive damages pursuant to Code of Civil Procedure section 425.13.

III.

DISCUSSION

A. *The trial court properly granted summary judgment in favor of the respondents*

    1. *Summary judgment standards*

"Summary judgment and summary adjudication provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute. [Citations.] A defendant moving for summary judgment or summary adjudication may demonstrate that the plaintiff's cause of action has no merit by showing that (1) one or more elements of the cause of action cannot be established, or (2) there is a complete defense to that cause of action." (*Collin v. CalPortland Co.* (2014) 228 Cal.App.4th 582, 587 (*Collin*).)

Generally, "the party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if [that party] carries [this] burden of production, [the moving party] causes

---

UHS opposed the request for judicial notice, arguing that "[a]ppellants are attempting to present new information that was not considered by the trial court in ruling on Inland Valley Medical Center's motion for summary judgment, and was not part of the documents presented to support their arguments in Appellants' Opening Brief." We disagree. The reporter's transcripts are from the underlying proceedings. Everything that occurred during these proceedings was known to, and presumably considered by, the trial court in making rulings with respect to the case, including rulings addressing the defendants' motions for summary judgment. The plaintiffs could have sought to augment the record on appeal to include these transcripts (see Cal. Rules of Court, rule 8.155(a)(1) ["At any time, on motion of a party or its own motion, the reviewing court may order the record augmented to include: [¶] . . . [¶] (B) A certified transcript—or agreed or settled statement—of oral proceedings not designated under rule 8.130"]. We see no reason why judicial notice of these transcripts should not be granted. We therefore grant the request for judicial notice.

10

a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850.) In moving for summary judgment, "all that the defendant need do is to show that the plaintiff cannot establish at least one element of the cause of action—for example, that the plaintiff cannot prove element *X*." (*Id.* at p. 853.) "A defendant moving for summary judgment or summary adjudication need not conclusively negate an element of the plaintiff's cause of action. [Citations.] Instead, the defendant may show through factually devoid discovery responses that the plaintiff does not possess and cannot reasonably obtain needed evidence." (*Collin*, *supra*, 228 Cal.App.4th at p. 587.)

"After the defendant meets its threshold burden [to demonstrate that a cause of action has no merit], the burden shifts to the plaintiff to present evidence showing that a triable issue of one or more material facts exists as to that cause of action or affirmative defense. [Citations.] The plaintiff may not simply rely on the allegations of its pleadings but, instead, must set forth the specific facts showing the existence of a triable issue of material fact. [Citation.] A triable issue of material fact exists if, and only if, the evidence reasonably permits the trier of fact to find the contested fact in favor of the plaintiff in accordance with the applicable standard of proof." (*Collin*, *supra*, 228 Cal.App.4th at p. 588.)

"On appeal, the reviewing court makes ' "an independent assessment of the correctness of the trial court's ruling [regarding summary judgment], applying the same legal standard as the trial court in determining whether there are any genuine issues of

11

material fact or whether the moving party is entitled to judgment as a matter of law." ' " (*Hesperia Citizens for Responsible Development v. City of Hesperia* (2007) 151 Cal.App.4th 653, 658.) Our task is to determine whether a triable issue of material fact exists. (*Collin*, *supra*, 228 Cal.App.4th at p. 588.) In independently examining the record on appeal "to determine whether triable issues of material fact exist," we " 'consider[ ] all the evidence set forth in the moving and opposition papers except that to which objections were made and sustained.' " (*Ambriz v. Kelegian* (2007) 146 Cal.App.4th 1519, 1530.)

2. *Summary adjudication of the claim for wrongful death as a result of medical negligence, as to both UHS and Lee*

Brenner, both in her capacity as representative of her husband's estate and individually, and Zach Brenner, individually[4], assert that the trial court erred in granting

---

[4]     Although neither party has raised this issue, it is not clear that all of the named plaintiffs may properly bring such a claim. The operative pleading titles this cause of action "Wrongful Death/Medical Negligence." A wrongful death cause of action is a statutory claim that allows for the compensation of specified heirs of the decedent for the loss they suffered as a result of the decedent's death. (Code Civ. Proc., §§ 377.60– 377.62; *San Diego Gas & Electric Co. v. Superior Court* (2007) 146 Cal.App.4th 1545, 1550–1551.) "The right to recover under a wrongful death theory is entirely statutory, and the wrongful death statutes create a new cause of action that did not exist in the common law." (*Adams v. Superior Court* (2011) 196 Cal.App.4th 71, 76 (*Adams*).) Code of Civil Procedure section 377.60 specifies who may bring a wrongful death action, and provides that such an action "may be brought by the heirs of the decedent *or* a personal representative on behalf of the heirs of the decedent." (*Adams*, *supra*, at p. 76, italics added.) As a result, "[e]ither the decedent's personal representative on behalf of the heirs *or* the specified heirs (either as plaintiffs or joined defendants) may assert the wrongful death claim—*but not both*." (*Id.* at p. 77, italics added.) Thus, it would appear that Brenner could bring a wrongful death action in her individual capacity, together with Zach Brenner, or in her capacity as the personal representative of her husband's estate; she is not entitled to bring such an action in both capacities.

summary adjudication of their claims for "Wrongful Death/Medical Negligence" against Lee and UHS.[5]   The trial court concluded that Lee and UHS were entitled to summary adjudication of the claims for wrongful death based on medical negligence because there was no triable issue of fact regarding the element of causation with respect to this cause of action.

As we have noted, "[a] cause of action for wrongful death is . . . a statutory claim. (Code Civ. Proc., §§ 377.60–377.62.)  Its purpose is to compensate specified persons— heirs—for the loss of companionship and for other losses suffered as a result of a decedent's death."  (*Quiroz v. Seventh Ave. Center* (2006) 140 Cal.App.4th 1256, 1263 (*Quiroz*).)  " 'The elements of the cause of action for wrongful death are the tort (negligence or other wrongful act), the resulting death, and the damages, consisting of the pecuniary loss suffered by the heirs.' "  (*Ibid.*, italics omitted.)

---

It appears, however, that Brenner may have been attempting to assert a separate wrongful death claim and/or negligence claim in her capacity as the representative of her husband's estate in order to seek relief for her husband's "pre-death pain and suffering," in addition to bringing a claim in her individual capacity for the loss that *she* personally suffered as a result of her husband's death.  However, the Code of Civil Procedure, section 377.34 precludes the personal representative of a decedent from recovering damages for his or her predeath pain and suffering:  "In an action or proceeding by a decedent's personal representative or successor in interest on the decedent's cause of action, the damages recoverable are limited to the loss or damage that the decedent sustained or incurred before death, including any penalties or punitive or exemplary damages that the decedent would have been entitled to recover had the decedent lived, and do not include damages for pain, suffering, or disfigurement." (Code Civ. Proc., § 377.34.)  Indeed, the record demonstrates that the trial court struck the request for predeath pain and suffering from the operative pleading.

5    Although plaintiffs assert two separate claims for "Wrongful Death/Medical Negligence" in the operative complaint—one as to UHS and the other as to individual defendants, including Lee—we will address these claims together, since they raise substantively identical issues for purposes of this appeal.

13

In wrongful death actions predicated on medical negligence, the plaintiff must show that the negligent act is a substantial factor in the causation of the death—that is, the plaintiff must demonstrate that there was "a 'reasonable medical probability' " that "the death was '*more likely than not'* the result of the negligence." (*Bromme v. Pavitt* (1992) 5 Cal.App.4th 1487, 1499, italics added.) " 'The law is well settled that in a personal injury action causation must be proven within a reasonable medical probability based upon competent expert testimony. Mere possibility alone is insufficient to establish a prima facie case.' " (*Lattimore v. Dickey* (2015) 239 Cal.App.4th 959, 970.)

Each defendant submitted the declaration of an expert with respect to the issues of medical negligence in support of their respective motions for summary judgment. UHS relied on the declaration of Dr. Kenneth Doan, who opined with respect to the element of causation:

> "Based on my review of the records, and the deposition transcripts listed above, and based on a reasonable degree of medical probability, the decline and eventual demise of Dale Brenner was not caused as a result of the nursing care provided by Inland Valley. [¶] . . . [¶] Any alleged injuries sustained by Mr. Brenner were not the result of any substandard care provided by the nurses or staff of Inland Valley. Furthermore, it is my opinion under the circumstances of this case, based on a reasonable degree of medical probability, that the care and treatment provided to Dale Brenner by the Inland Valley nurses and staff was *not a substantial factor in causing any alleged harm, injury or damage* to him. No act or omission of the non-physician staff of Inland Valley involved in the care and treatment of Mr. Brenner was a direct or proximate cause of injury to Mr. Brenner." (Italics added.)

14

Dr. Lee relied on the expert opinion of Dr. Russell Klein, who provided a declaration. Dr. Klein opined with respect to the element of causation as to any harm Brenner may have suffered:

> "Based on my education, training and experience, and my review of the records pertaining to plaintiff, it is my opinion to a reasonable degree of medical probability that no act or omission . . . rendered to the decedent Dale Brenner by Young H. Lee, M.D., caused or was a substantial factor in causing the decedent's death. [¶] . . . It is my opinion that the hematoma that developed on the decedent's neck following the placement of the central line was not caused by inappropriate placement by Dr. Lee. Both the post-central line placement x-rays and CT scan show that the central line had been placed in the appropriate position by Dr. Lee. [¶] . . . To a reasonable degree of medical probability, the right neck hematoma developed as an unavoidable complication of the patient being on blood thinners while undergoing emergent placement of the central line. [¶] . . . [¶] . . . The critical event that caused the decedent's death was the large left hemispheric stroke the decedent suffered in the emergency room at the time of admission to Inland Valley Medical Center prior to Dr. Lee's involvement in the decedent's care. [¶] . . . This type of stroke confers a very high short and long term mortality, and those who do not die shortly after this type of stroke go on to live a crippled and dependent lifestyle in which they are unable to speak, understand language, and unable to feed themselves. The Scripps Hospital records show that the patient's family ultimately elected to withdraw support and placed him on hospice because the decedent had made it clear to them he would not want this kind of dependent life.
>
> ". . . Therefore, it is my opinion based on the medical evidence and to a reasonable medical probability, that the decedent died as a consequence of his large left hemispheric stroke, the usual expected complications of aphasia, dysphagia, and possibly aspiration pneumonia related to that stroke, and ultimately his family's decision to allow him to pass away according to his previously expressed wishes."

On appeal, the plaintiffs take issue with the sufficiency of the expert declarations submitted by the defendants in support of their motions for summary judgment, arguing

15

that the declarations are "conclusory" and either "without explanation of the basis for [the expert's] opinion" (as to Dr. Doan's declaration) or not "substantiated by the medical records" (as to Dr. Klein's declaration). We reject this contention because, as described above, each of these expert declarations sets forth a factual basis for the expert's opinion. (See *Bushling v. Fremont Medical Center* (2004) 117 Cal.App.4th 493, 509 [expert opinion that there was no malpractice based on review of "pertinent medical records" is "not an improper conclusion for an expert witness"].) For example, Dr. Klein provided a lengthy summary of the medical records that he reviewed, including records from Inland Valley Medical Center, Menifee Valley Medical Center, Scripps Clinic, and Scripps Green Hospital. He specifically states, as well, that his opinion with respect to causation is based on his review of these medical records. Similarly, Dr. Doan, who provided a nine-page declaration, also recited the factual basis of his opinion, and noted that his opinion is based on his review of Brenner's medical records from these same medical facilities, as well as Brenner's death certificate and the deposition transcripts in the case. These expert declarations are not "conclusory," as plaintiffs contend, but rather, provide adequate explanation regarding the basis for their ultimate opinions.

Because the defendants produced competent expert declarations showing that there is no triable issue of fact on the element of causation with respect to the alleged medical negligence, the burden fell to the plaintiffs to "produce a competent expert declaration to the contrary." (*Bozzi v. Nordstrom, Inc.* (2010) 186 Cal.App.4th 755, 761–762 ["When the moving party produces a competent expert declaration showing there is

16

no triable issue of fact on an essential element of the opposing party's claims, the opposing party's burden is to produce a competent expert declaration to the contrary"].)

In response to the defendants' expert declarations, the plaintiffs submitted the expert declaration of Dr. Mehrnaz Hadian. Dr. Hadian identified a number of ways in which she believed that the care provided by Dr. Lee and the staff at Inland Valley Medical Center fell below the applicable standard of care. Dr. Hadian also provided a number of criticisms with respect to the statements, conclusions, and opinions provided by Dr. Klein. With respect to the issue of causation, Dr. Hadian stated the following:

> "After that transfer [to the Progressive Care Unit], it is my opinion, based on the evidence contained in the patient's chart, that Mr. Brenner suffered an aspiration event late June 4, 2012 or early June 5, 2012, which resulted in aspiration pneumonia. This complication, which with a reasonable degree of medical certainty happened due to tube feeding him while being on BiPAP and/or placing his head flat by the nursing staff without stopping the tube feed, severely hindered Mr. Brenner's recovery from the stroke. In addition, the sustained dangerously high blood sugar levels further impeded the healing process, and caused Mr. Brenner additional problems for his body to cope with, which was already under great stress. The final insult was the complications during the central line placement procedure, which was caused by Dr. Lee's breach of the standard of care. Accordingly, it is my opinion that Brenner *could have* survived the stroke that he suffered on May 31, 2012, had Defendants[ ] collectively not deviated from the standard of care during 21 days of hospitalization causing him serious preventable complications." (Italics added.)

As the trial court concluded, Dr. Hadian's opinion regarding causation does not raise a triable issue of fact with respect to the cause of Brenner's death because it does not establish anything more than a *possibility* that Brenner would not have died if any of the instances of breaches of the standard of care that Dr. Hadian identifies had not occurred.

17

Specifically, Dr. Hadian stated merely that Brenner "*could* have survived the stroke" if the defendants, collectively, had not deviated from the standard of care.[6]

Again, "[m]ere possibility alone is insufficient to establish a prima facie case." (*Jones v. Ortho Pharmaceutical Corp.* (1985) 163 Cal.App.3d 396, 402–403.) "That there is a distinction between a reasonable medical 'probability' and a medical 'possibility' needs little discussion. There can be many possible 'causes,' indeed, an infinite number of circumstances which can produce an injury or disease. A possible cause only becomes 'probable' when, in the absence of other reasonable causal explanations, *it becomes more likely than not that the injury was a result of its action*. This is the outer limit of inference upon which an issue may be submitted to the jury." (*Id.* at p. 403, italics added.)

By stating that Brenner "could have survived" the stroke that he suffered in the absence of any deviation from the standard of care, collectively, Dr. Hadian does not opine that Brenner's death was *more likely than not* the result of any particular negligent act nor the result of all of the identified negligent acts, collectively. Rather, she offers an opinion that it is *possible* that he would have survived the stroke, but for the identified breaches of the standard of care. Significantly, at the hearing on UHS's motion for summary judgment, counsel for the plaintiffs indicated that Dr. Hadian had been unwilling to use the word "would" instead of "could" in her declaration in the relevant

---

6    We acknowledge that Dr. Hadian presented a number of opinions as to when, during Brenner's hospitalization, various medical staff deviated from the standard of care. We assume for purposes of this argument that Dr. Hadian's declaration establishes that such deviations from the standard of care occurred.

statement. In using the word "could," Dr. Hadian opined only that it was possible that Brenner might have survived, but for the deviations from the standard of care, not that he would have survived. This is not sufficient to establish that the identified deviations from the standard of care were more likely than not the cause of Brenner's demise.

The plaintiffs suggest that the trial court's focus on Dr. Hadian's use of the word "could" was error, because, they contend, one could reasonably infer from Dr. Hadian's opinions that any and all of the defendants' conduct "contributed to the death of Mr. Brenner." Thus, they assert, the trial court's focus on the word "could" amounted to an "improper weighing of evidence." We disagree. The salient question for purposes of determining whether there is a material fact in dispute that should be determined by a jury with respect to causation is whether there is evidence that the asserted breach or breaches of the standard of care was/were a substantial factor in causing the decedent's death. In order to survive summary adjudication in the face of evidence presented by the defendants that the asserted deviations from the standard of care were not a substantial factor in causing the death, the plaintiffs had to present evidence to establish that there was something more than a mere *possibility* that Brenner would have survived, but for the identified deviations. Dr. Hadian's choice of phrasing was the focus of the trial court's consideration, not because the trial court was attempting to weigh the evidence, but because the court was attempting to determine whether Dr. Hadian had provided any evidence to demonstrate that the alleged deviations in the standard of care were more likely than not the cause of Brenner's death. As we have explained, Dr. Hadian's

description is insufficient to establish anything other than the existence of a possibility that Brenner would have survived, but for the alleged breaches in the standard of care.

The plaintiffs' reliance on *Uriell v. Regents of University of California* (2015) 234 Cal.App.4th 735 (*Uriell*) is misplaced. Citing to *Uriell*, the plaintiffs argue that even if an expert cannot determine "with certainty a sole cause of death, or how long a patient may have lived absent the negligent conduct, Plaintiffs still meet the threshold necessary to meet their prima facie burden on causation." In the portion of the opinion that is published, the *Uriell* court addresses the defendant's contention that the trial court erred in instructing the jury with respect to the element of causation in a wrongful death cause of action. (*Id.* at p. 742.) Despite presenting a very different issue on appeal, an examination of the evidence presented in *Uriell* demonstrates why Dr. Hadian's declaration is insufficient to create a triable issue of fact with respect to the element of causation. Specifically, the testimony of the plaintiffs' expert in *Uriell* was that "to a reasonable degree of medical probability [the decedent] *would have* survived 10 additional years if her cancer had been timely diagnosed and treated in 2007." (*Id.* at p. 735, italics added.) In contrast, Dr. Hadian's declaration stated that Brenner "could have" survived the stroke if the defendants had provided care that met the applicable standards of care. Dr. Hadian's statement establishes a *possibility* that Brenner would have survived. It is insufficient, however, to establish a *probability* that he would have.

We reject the plaintiffs' contention that the trial court erred in concluding that there was no evidence creating a triable issue of fact on the wrongful death cause of action because the court failed to consider evidence presented in the death certificate.

20

According to the plaintiffs, the death certificate "provides additional evidence corroborating Dr. Hadian's opinions as to causation." However, the plaintiffs' description of the evidence provided by the death certificate is imprecise. Specifically, the plaintiffs suggest that the death certificate lists "the hematoma, caused by the complications from the central line placement, as a contributing cause of Mr. Brenner's death." However, there was no evidence offered with respect to the summary judgment motions to give meaning to the terms used on the death certificate. Significantly, there was no expert opinion offered to demonstrate that a "contributing cause" on a death certificate is equivalent to a "substantial factor" causing a death. We therefore reject the notion that the death certificate would permit a court to conclude that evidence of the death certificate, in conjunction with Dr. Hadian's declaration, establishes the existence of a triable issue of fact with respect to the element of causation.

We conclude that defendants UHS and Lee have demonstrated that they are entitled to judgment as a matter of law with respect to the plaintiffs' claim for wrongful death based on medical negligence. The plaintiffs have not demonstrated, in response to the defendants' evidence, that a triable issue of material fact exists with respect to the element of causation.

3. *Retaliation in violation of Health and Safety Code section 1278.5 as to UHS and Lee*

The plaintiffs contend that the trial court erred in granting summary adjudication in favor of the defendants on the cause of action for retaliation, in violation of Health and Safety Code section 1278.5 (Section 1278.5). Section 1278.5 provides in relevant part:

21

"(a) The Legislature finds and declares that it is the public policy of the State of California to encourage patients, nurses, members of the medical staff, and other health care workers to notify government entities of suspected unsafe patient care and conditions. The Legislature encourages this reporting in order to protect patients and in order to assist those accreditation and government entities charged with ensuring that health care is safe. The Legislature finds and declares that whistleblower protections apply primarily to issues relating to the care, services, and conditions of a facility and are not intended to conflict with existing provisions in state and federal law relating to employee and employer relations.

"(b)(1) No health facility shall discriminate or retaliate, in any manner, against any patient, employee, member of the medical staff, or any other health care worker of the health facility because that person has done either of the following:

"(A) Presented a grievance, complaint, or report to the facility, to an entity or agency responsible for accrediting or evaluating the facility, or the medical staff of the facility, or to any other governmental entity.

"(B) Has initiated, participated, or cooperated in an investigation or administrative proceeding related to, the quality of care, services, or conditions at the facility that is carried out by an entity or agency responsible for accrediting or evaluating the facility or its medical staff, or governmental entity.

"(2) No entity that owns or operates a health facility, or which owns or operates any other health facility, shall discriminate or retaliate against any person because that person has taken any actions pursuant to this subdivision.

"(3) A violation of this section shall be subject to a civil penalty of not more than twenty-five thousand dollars ($25,000). The civil penalty shall be assessed and recovered through the same administrative process set forth in Chapter 2.4 (commencing with Section 1417) for long-term health care facilities.

"(c) Any type of discriminatory treatment of a patient by whom, or upon whose behalf, a grievance or complaint has been submitted, directly or indirectly, to a governmental entity or received by a health facility administrator within 180 days of the filing of the

22

grievance or complaint, shall raise a rebuttable presumption that the action was taken by the health facility in retaliation for the filing of the grievance or complaint.

"(d)(1) There shall be a rebuttable presumption that discriminatory action was taken by the health facility, or by the entity that owns or operates that health facility, or that owns or operates any other health facility, in retaliation against an employee, member of the medical staff, or any other health care worker of the facility, if responsible staff at the facility or the entity that owns or operates the facility had knowledge of the actions, participation, or cooperation of the person responsible for any acts described in paragraph (1) of subdivision (b), and the discriminatory action occurs within 120 days of the filing of the grievance or complaint by the employee, member of the medical staff or any other health care worker of the facility."

Subdivisions (b)(1) and (b)(2) of Section 1278.5 create the statutory prohibition against discrimination and/or retaliation on the part of a health facility or an entity that owns a health facility against certain identified individuals—i.e., against a "patient, employee, member of the medical staff, or any other health care worker of the health facility."

According to the plaintiffs, both defendant UHS and defendant Lee unlawfully retaliated against Brenner as a result of Nancy's complaints to staff at the hospital about the care her husband was receiving.[7]

---

[7] The parties do not address Zach's standing to appeal the summary adjudication of this claim. As the plaintiffs concede, however, there has never been any allegation that anyone took discriminatory or retaliatory actions against Brenner as a result of complaints made *by Zach*. Therefore, although ostensibly both plaintiffs (Zach and Nancy, in both of her capacities) appeal from the trial court's granting of summary adjudication of the Section 1278.5 claim in favor of the defendants, it appears that Zach is not entitled to bring this claim against the defendants even under the theory for standing that the plaintiffs' proffer with respect to Nancy.

a. *Summary adjudication of the statutory retaliation claim asserted against Lee was proper*

After the parties briefed the issues on appeal, another appellate court issued an opinion interpreting the text of Section 1278.5 and concluding that the statute does not create a claim as against individual doctors. (See *Armin v. Riverside Community Hospital* (2016) 5 Cal.App.5th 810, 832 (*Armin*) ["We conclude section 1278.5 does *not* allow individual doctors to be sued"].) The *Armin* court explained that subdivision (b) of Section 1278.5 focuses on health care facilities, and prohibits only facilities from retaliating against the individuals who fall within the identified groups: "Subdivision (b) is the operative subdivision, forbidding facilities, *and only facilities*, from retaliating against individuals who complain of potentially unsafe care or conditions—even if they complain to somebody other than a government entity. The civil penalty provision in subdivision (b) confirms the focus on the hospital-facility, by referring the reader to statutes regulating nursing homes." (*Armin*, *supra*, at pp. 832–833.) We agree with the *Armin* court's analysis and interpretation of the statute, adopt it here, and conclude that the plaintiffs are unable to state a statutory retaliation claim, pursuant to Section 1278.5, as to defendant Lee because the statute does not create a claim against individual doctors.

b. *Summary adjudication of the statutory retaliation claim asserted against UHS was proper*

We next consider whether summary adjudication of the plaintiffs' claim against UHS based on Section 1278.5 was appropriate. We conclude that it was, based on our interpretation of the statute as to those persons whose complaints and/or conduct with respect to an investigation of a facility fall within its purview.

24

In addressing this issue, we rely on well-established and familiar principles of statutory interpretation: "Our primary task in interpreting a statute is to determine the Legislature's intent, giving effect to the law's purpose. [Citation.] We consider first the words of a statute, as the most reliable indicator of legislative intent. [Citation.] ' " 'Words must be construed in context, and statutes must be harmonized, both internally and with each other, to the extent possible.' [Citation.] Interpretations that lead to absurd results or render words surplusage are to be avoided." ' " (*Tuolumne Jobs & Small Business Alliance v. Superior Court* (2014) 59 Cal.4th 1029, 1037.)

To the extent the statutory language is ambiguous, "we may resort to extrinsic sources, including the ostensible objects to be achieved and the legislative history." (*Day v. City of Fontana* (2001) 25 Cal.4th 268, 272.) "If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy." (*Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737; accord, *Imperial Merchant Services, Inc. v. Hunt* (2009) 47 Cal.4th 381, 388.) Further, a "statute's every word and provision should be given effect so that no part is useless, deprived of meaning or contradictory. Interpretation of the statute should be consistent with the purpose of the statute and statutory framework." (*Fireman's Fund Ins. Co. v. Workers' Comp. Appeals Bd.* (2010) 189 Cal.App.4th 101, 109.) " ' "An interpretation that renders related provisions nugatory must be avoided [citation]; each sentence must be read not in isolation but in the light of the statutory scheme [citation]; and if a statute is amenable to

25

two alternative interpretations, the one that leads to the more reasonable result will be followed." ' " (*People v. Kirk* (2006) 141 Cal.App.4th 715, 720–721.)

The parties dispute whether a Section 1278.5 claim lies when the complaints or grievances made to hospital staff and/or administrators about patient care are made by someone other than the patient. UHS refers to the portion of the statute that creates the cause of action—i.e., subdivision (b)—to assert that only a patient who has made a complaint himself or herself may bring a claim pursuant to Section 1278.5. That provision does appear to limit the individuals for whom statutory protection has been granted, since it prohibits discrimination or retaliation against "against any patient, employee, member of the medical staff, or any other health care worker of the health facility *because that person* has" either "[p]resented a grievance, complaint, or report to the facility, to an entity or agency responsible for accrediting or evaluating the facility, or the medical staff of the facility, or to any other governmental entity" or "initiated, participated, or cooperated in an investigation or administrative proceeding related to, the quality of care, services, or conditions at the facility that is carried out by an entity or agency responsible for accrediting or evaluating the facility or its medical staff, or governmental entity." (Section 1278.5, subd. (b)(1) & (2), italics added.) By its terms, subdivision (b) of section 1278.5 appears to limit a cause of action to any of the listed individuals who, themselves, have made a complaint or been involved in an investigation or administrative proceeding.

However, the plaintiffs point out that subdivision (c) of Section 1278.5, which creates an evidentiary presumption for purposes of asserting a claim pursuant to the

26

statute, makes reference to a "grievance or complaint" that has been made on "behalf" of a patient. Specifically, subdivision (c) provides that a rebuttable presumption of retaliation is created anytime that there is "[a]ny type of discriminatory treatment of a patient by whom, *or upon whose behalf*, a grievance or complaint has been submitted, directly or indirectly, to a governmental entity or received by a health facility administrator within 180 days of the filing of the grievance or complaint." (Italics added.) The plaintiffs assert that "[i]t . . . follows that *an individual making complaints on behalf of a patient* has standing under the statute." (Italics added.)

First, we conclude that, contrary to plaintiffs' contention, the reference to "upon whose behalf" in subdivision (c) of Section 1278.5 does not vest any and all persons who complain on behalf of a patient with "standing" to bring a claim under Section 1278.5. Section 1278.5, subdivision (c) does not itself create a statutory cause of action. Rather, it merely expresses the circumstances under which an evidentiary presumption as to the existence of retaliation is created. Subdivision (b) of the statute is the provision that creates the statutory right that may be vindicated. As we have already indicated, subdivision (b) of Section 1278.5 grants the right to bring an action for discrimination or retaliation pursuant to the statute *solely to the individuals identified* in subdivision (b), i.e., "patient[s], employee[s], member[s] of the medical staff, or any other health care worker[s] of the health facility" who *themselves* have made a complaint. Subdivision (b) does not permit an individual who is not a patient and not an employee, member of the medical staff, or other health care worker at the facility, but who has complained on behalf of a patient, to bring a claim for discrimination or retaliation, either against that

27

individual or against the patient. Thus, to the extent that Nancy is attempting to assert a cause of action on her own behalf (i.e., in her individual capacity), she does not have standing to do so under the statute because there is no suggestion that Nancy is one of the identified individuals who may bring a claim under the statute.

Nor does Nancy have standing, in her individual capacity, to assert any rights that Brenner, as the patient, may have had pursuant to the statute. As a general rule, a third party does not have standing to bring a claim asserting a violation of someone else's rights. (See *Powers v. Ohio* (1991) 499 U.S. 400, 410 ["In the ordinary course, a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties"].)[8]

However, Nancy has also filed this action as a representative of Brenner's estate. In this role, she may be able to bring claims for relief based on Brenner's legal rights, pursuant to the survival statutes. Specifically, Code of Civil Procedure section 377.30 provides: "A cause of action that survives the death of the person entitled to commence an action or proceeding passes to the decedent's successor in interest . . . and an action may be commenced by the decedent's personal representative or, if none, by the decedent's successor in interest." A survivor claim is a claim asserted on behalf of the victim or decedent. (*Quiroz, supra*, 140 Cal.App.4th at p. 1281.)[9] Therefore, in her role

_____

[8]     This rule would also prevent Zach, in his individual capacity, from being able to assert a claim on Brenner's behalf under Section 1278.5.

[9]     Again, a survivor cause of action is distinct from a cause of action for wrongful death. Unlike a cause of action for wrongful death, a survivor cause of action is not a new cause of action that vests in the heirs on the death of the decedent, but is instead a

as representative of Brenner's estate, Nancy appears to have "standing" to assert a claim for *Brenner's* entitlement to recovery, if such entitlement exists, under Section 1278.5.

The fact that Nancy may have standing to assert a claim on behalf of Brenner's estate pursuant to Section 1278.5 does not end our inquiry, however. We must determine whether UHS is nevertheless entitled to summary adjudication with respect to this claim. We conclude that the statute does not permit any survivor claim that Nancy may be bringing on behalf of Brenner's estate arising from an alleged violation of Section 1278.5.

Specifically, the question that we must address is whether the statute protects a patient from alleged "retaliation" resulting from complaints made by persons other than those identified in subdivision (b) of the statute. In other words, does the statute create a cause of action for discrimination and/or retaliation against a patient that occurs as a result of a relative, friend, or someone other than the patient, or medical or hospital staff, making a complaint about the patient's care? As we shall explain, we conclude that the statute is drawn more narrowly than plaintiffs suggest, and that it does not allow for recovery under the circumstances presented in this case.

First, as explained above, subdivision (b) of Section 1278.5, when given its plain meaning, provides protection, and a cause of action, solely to *the person who himself or*

---

separate and distinct cause of action that belonged to the decedent before death, but by statute, survives that event. (*Quiroz*, *supra*, 140 Cal.App.4th at p. 1264.) These claims are technically asserted by different plaintiffs and seek compensation for different injuries than the injury asserted in a wrongful death cause of action. (*Id.* at p. 1278.) The survival statutes do not create a cause of action, but provide for the postdeath enforcement of a cause of action on behalf of the decedent. Damages for a survivor cause of action are limited to those sustained by the decedent or incurred before death. (*Id.* at p. 1264.)

*herself has engaged in the protected whistleblowing activity* (i.e., the patient, or employee or other staff member who presented a grievance complaint or report about patient care, or initiated, cooperated with, or participated in an investigation about patient care) and who suffered discriminatory or retaliatory acts by the health care facility as a result of that whistleblowing activity.  The purpose of the statute, as described in subdivision (a) of Section 1278.5, supports this view of subdivision (b):  "[I]t is the public policy of the State of California to encourage *patients, nurses, members of the medical staff, and other health care workers* to notify government entities of suspected unsafe patient care and conditions."  (Italics added.)  In order to further the identified public policy, the Legislature has decided to afford protections to these particular individuals with respect to their conduct in notifying "government entities of suspected unsafe patient care and conditions," as well as in notifying the health care facilities, themselves, of suspected unsafe patient care and conditions.  (Section 1278.5, subd. (b).)  It is thus clear that Section 1278.5 has, as its primary focus, the protection of those who engage in what are considered "whistleblowing" activities.  As so interpreted, the protections of subdivision (b) of section 1278.5 are limited to protecting the identified individuals from discrimination or retaliation based on *their own* whistleblowing activity, and not from discrimination or retaliation based on another person's whistleblowing activity.  The evidence presented on summary judgment demonstrates that the "complaints" on which the cause of action is based are complaints made by Nancy, who was not a "patient, employee, member of the medical staff, or any other health care worker of the health facility" (Section 1278.5, subd. (b)(1)).

30

However, as the plaintiffs point out, a plain reading of *subdivision (c)* of section 1278.5 demonstrates that a patient is entitled to an evidentiary presumption in favor of the existence of retaliation whenever there has been any discriminatory treatment of the patient undertaken within 180 days of the submission of a grievance or complaint to a governmental entity, or within 180 days of receipt of a grievance or complaint by a health facility administrator, when that grievance or complaint was made by the patient or was made "*upon [the patient's] behalf*." (Italics added.)[10] The plaintiffs contend that the phrase "upon whose behalf" in subdivision (c) of the statute "is clear on its face that complaints may be made 'on behalf of' a patient."

In our view, however, the intersection of subdivisions (b) and (c) of Section 1278.5 is far from "clear." Rather, these subdivisions appear, on their face, to be contradictory. Subdivision (b) states that only when one of the identified individuals, including a patient, makes a complaint *himself or herself* is he or she protected from discrimination and/or retaliation from a health care facility. For example, subdivision (b) protects a patient from discrimination or retaliation by the health facility when that patient makes a complaint about patient care, and also protects an employee of the health facility from discrimination or retaliation by the health facility when that employee makes a complaint about patient care. Thus, under the plain text of subdivision (b), a

---

[10]    Again, the full text of subdivision (c) of section 1278.5 provides:  "Any type of discriminatory treatment of a patient by whom, *or upon whose behalf*, a grievance or complaint has been submitted, directly or indirectly, to a governmental entity or received by a health facility administrator within 180 days of the filing of the grievance or complaint, shall raise a rebuttable presumption that the action was taken by the health facility in retaliation for the filing of the grievance or complaint."  (Italics added.)

patient or an employee who himself or herself complains about patient care and is discriminated or retaliated against as a result of making that complaint has a claim under Section 1278.5 against the health facility that engaged in the discriminatory or retaliatory act. Subdivision (b), by its plain terms however, does not appear to provide a patient with a claim for retaliation or discrimination as a result of an *employee* complaining about that patient's care. In other words, subdivision (b), by its terms, protects from discrimination or retaliation only the individual who complains or engages in other whistleblowing activity.

Despite the wording of subdivision (b), subdivision (c) of Section 1278.5 appears to contemplate that a patient may meet his or her evidentiary burden to prove an entitlement to recover under Section 1278.5 when that patient can show that he or she complained, *or* that someone else complained on his or her behalf, and that within 180 days of the making of the complaint, the patient suffered some discriminatory act. Given that subdivision (b) of the statute envisions that the person protected by the statute, and the person who is thus entitled to recover for discrimination or retaliation under the statute, *is the person who made a complaint or engaged in other protected activity*, subdivision (c)'s suggestion that a patient is entitled to an evidentiary presumption of retaliation under the statute even when the patient *is not the person who made the complaint*, appears to be in conflict with subdivision (b), at least with respect to the circumstances under which a *patient*, as opposed to an employee, staff member or other health care worker, is entitled to protection under the statute.

When faced with potentially inconsistent statutory provisions, " '[a] court must, where reasonably possible, harmonize [the] statutes, reconcile seeming inconsistencies in them, and construe them to give force and effect to all of their provisions. [Citations.] This rule applies although one of the statutes involved deals generally with a subject and another relates specifically to particular aspects of the subject.' [Citation.] Thus, when ' "two codes are to be construed, they 'must be regarded as blending into each other and forming a single statute.' [Citation.] Accordingly, they 'must be read together and so construed as to give effect, when possible, to all the provisions thereof.' " ' " (*Pacific Palisades Bowl Mobile Estates, LLC v. City of Los Angeles* (2012) 55 Cal.4th 783, 805.)

Reading subdivisions (b) and (c) together, and construing them so as to give effect to both provisions, we conclude that the most reasonable interpretation of subdivision (c)'s reference to a grievance or complaint being made "upon [the patient's] behalf" is that it is referring to a grievance or complaint that has been submitted by one of the other individuals identified in subdivision (b)—i.e., an "employee, member of the medical staff, or any other health care worker of the health facility"—on a patient's behalf. We recognize that in doing so, we must interpret subdivision (b) to mean something slightly different from what its plain meaning would suggest. Given that subdivision (c), as we interpret it, creates an evidentiary presumption in favor of a patient against whom retaliation has occurred when a person who works for or within a health facility makes a complaint on that patient's behalf, subdivision (b) must be interpreted so as to permit a cause of action to be brought by any patient against whom a health facility discriminates or retaliates as a result of the patient *or* one of the other identified persons (i.e., an

33

employee, member of the medical staff, or any other health care worker of the health facility) having engaged in whistleblower actions on that patient's behalf. Thus, we interpret subdivision (b)(1) as prohibiting a health facility from both discriminating or retaliating against any of the identified individuals as a result of that particular individual undertaking whistleblowing activity, and also from discriminating or retaliating against a *patient* as a result of one of the other identified individuals (i.e., an employee, member of the medical staff, or other health care worker of the facility) undertaking whistleblowing activity on behalf of that patient. Such an interpretation fulfills the stated policy of Section 1278.5 by prohibiting discrimination and/or retaliation against any patient, employee, member of the medical staff or other health care worker of the health facility as a result of any patient, employee, member of the medical staff or other health care worker of the heath facility having engaged in whistleblowing activities surrounding suspected unsafe patient care and conditions; it also harmonizes the otherwise conflicting subdivisions at issue in this case.

Given our interpretation of Section 1278.5, we conclude that defendant UHS is entitled to judgment as a matter of law with respect to Nancy's survivor claim under Section 1278.5. The plaintiffs concede that the "complaints" on which they base the claim were made by Nancy, who was not a "patient, employee, member of the medical staff, or . . . health care worker of the health facility." Thus, any alleged discrimination or retaliation that UHS purportedly engaged in as to Brenner does not fall within the

provisions of Section 1278.5.[11]  Summary adjudication of this claim in favor of UHS was therefore proper.

    4.   *Elder abuse, as asserted against UHS only*

The plaintiffs contend that the trial court erred in granting summary adjudication of their cause of action under the Elder Abuse and Dependent Adult Civil Protection Act (Elder Abuse Act) (see Welf. & Inst. Code, § 15600 et seq.) in favor of defendant UHS. According to the plaintiffs, they provided "sufficient evidence demonstrating reckless conduct on behalf of Respondent UNIVERSAL, or at a minimum, a triable issue of fact as to the conduct" so as to preclude summary adjudication of this claim.

---

[11]    Our interpretation of the statute leaves open the question whether an individual who is acting on behalf of an incapacitated patient in making medical decisions for that patient pursuant to a heath care directive may be considered to be stepping into the shoes of the patient and acting *as the patient* for purposes of Section 1278.5.  Although the plaintiffs mention in their reply brief that Nancy "stated she had power of attorney to make health decisions for Mr. Brenner," this suggestion is insufficient to allow us to address this issue on appeal.  First, it is clear that the plaintiffs have not raised this legal argument.  Although they mention that Nancy stated that she had power of attorney, the legal argument that they make on appeal is that this fact supports their position that there is "no issue that Mrs. Brenner has standing for her complaints brought on behalf of her husband."  This is distinct from a legal argument that Nancy was, essentially, acting in the role of a "patient" under section 1278.5, subdivision (b)(1), pursuant to a health care directive.

    Further, even if the plaintiffs had made this legal argument, the only portion of the record to which they cite would not permit them to avoid summary judgment.  This is because the record reference is to Nancy's declaration in which she states the following: "The nurse, Leslie, continued to argue with me but I would not back down.  I informed the nurse that I was Dale's power of attorney and decision maker with respect to his health care."  Notably, Nancy does not declare that she *was* acting pursuant to a health care directive and was making decisions on Brenner's behalf because he was incapacitated.  Rather, she states merely that she told someone else that she had power of attorney to make medical decisions.  Further, the plaintiffs have not cited to anything else in the record, such as a copy of any health care directive, that could establish that Nancy was acting, pursuant to some legal authority, in Brenner's shoes as the patient.

35

In 1991, "the Legislature added Welfare and Institutions Code section 15657 to the [Elder Abuse] Act[, which had previously established requirements and procedures for reporting the abuse of elderly individuals and other dependent adults, as well as addressed agency investigation and criminal prosecution of abuse cases].  That section makes available, to plaintiffs who prove especially egregious elder abuse to a high standard, certain remedies 'in addition to all other remedies otherwise provided by law.' " (*Covenant Care, Inc. v. Superior Court* (2004) 32 Cal.4th 771, 779 (*Covenant Care*), citing Welf. & Inst. Code, § 15657.)  "[A] plaintiff who proves 'by clear and convincing evidence' that a defendant is liable for physical abuse, neglect, or financial abuse (as these terms are defined in the Act), *and* that the defendant has been guilty of 'recklessness, oppression, fraud, or malice' in the commission of such abuse, may recover attorney fees and costs." (*Covenant Care*, *supra*, at p. 779, italics added.)  "On the same conditions, a plaintiff who brings suit as the personal representative of a deceased elder is partially relieved of the limitation on damages in a decedent's action imposed by Code of Civil Procedure section 377.34 and thus may recover damages up to $250,000 for emotional distress suffered by the decedent prior to death." (*Id.* at pp. 779–780, citing Welf. & Inst. Code, § 15657, subd. (b).)[12]

The Elder Abuse Act's heightened remedies do not apply to acts of professional negligence.  (Welf. & Inst. Code, § 15657.2; *Delaney v. Baker* (1999) 20 Cal.4th 23, 31–

_____

[12]     There appears to be an issue with respect to the individual plaintiffs' standing to bring this claim, since they, themselves, were not harmed by the alleged abuse.  It appears that only Nancy, in her capacity as the representative of Brenner's estate, would have standing to bring the claim.  The parties have not addressed this issue on appeal.

32 (*Delaney*).)  The Elder Abuse Act therefore does not provide liability for simple or even gross negligence by health care providers. (*Sababin v. Superior Court* (2006) 144 Cal.App.4th 81, 88.)[13]  Plaintiffs must plead and prove something *more than negligence*—that is, they must plead and prove that the defendant's conduct was reckless, oppressive, fraudulent, or malicious.  (*Carter v. Prime Healthcare Paradise Valley LLC* (2011) 198 Cal.App.4th 396, 406.)  "The latter three categories involve 'intentional,' 'willful,' or 'conscious' wrongdoing of a 'despicable' or 'injurious' nature."  (*Delaney*, *supra*, at p. 31.)  Recklessness is "a subjective state of culpability greater than simple negligence, which has been described as a 'deliberate disregard' of the 'high degree of probability' that an injury will occur.  [Citations.]  Recklessness, unlike negligence, involves more than 'inadvertence, incompetence, unskillfulness, or a failure to take precautions' but rather rises to the level of a 'conscious choice of a course of action . . . with knowledge of the serious danger to others involved in it.' "  (*Id.* at pp. 31–32.)  In addition, a plaintiff must also allege and ultimately prove by clear and convincing evidence that the abuse or neglect resulted in the elder or dependent adult suffering physical harm, pain or mental suffering.  (Welf. & Inst. Code, §§ 15610.07, subds. (a), (b), 15657.)

The plaintiffs rely on Dr. Hadian's declaration in support of their contention that they provided sufficient evidence to demonstrate the existence of reckless conduct on the

---

[13]    Gross negligence is defined as the lack of even scant care or an extreme departure from the ordinary standard of conduct.  (*City of Santa Barbara v. Superior Court* (2007) 41 Cal.4th 747, 754.)

part of UHS, or to create a triable issue of fact as to recklessness. For example, they refer to the fact that Dr. Hadian "opined that the nurses' failures with respect to Mr. Brenner's dangerously high blood sugar levels, the aspiration event, the nurse's conduct during and following the central line procedure, and the nurses' failures in dealing with Mrs. Brenner, and handling her requests to speak with physicians and administrators regarding her husband's care plan was reckless and contributed to Mr. Brenner's death."

Notably, the plaintiffs fail to provide any record citations to support their assertions about the state of the record with respect to whether there is evidence to support a finding of recklessness. An appellant who fails to cite accurately to the record forfeits the issue or argument on appeal that has been presented without the proper record reference(s). (*City of Lincoln v. Barringer* (2002) 102 Cal.App.4th 1211, 1239 (*City of Lincoln*).) Indeed, California Rules of Court, rule 8.204(a)(1)(C) provides that each brief must "[s]upport *any reference to a matter in the record* by a citation to the volume and page number of the record where the matter appears." (Italics added.) The purpose of this rule is to enable appellate justices and staff attorneys to locate relevant portions of the record expeditiously. (*City of Lincoln*, *supra*, at p. 1239, fn. 16.) Given the lack of record references in plaintiffs' briefing with respect to this argument, we could therefore decline to consider the plaintiffs' argument with respect to their Elder Abuse Act claim.[14]

However, even considering the merits of the plaintiffs' contentions with respect to the conduct on the part of the nurses at Inland Valley Medical Center that the plaintiffs'

---

14    The plaintiffs do not address this issue in their reply brief. Therefore, the argument is presented only in the opening brief.

38

maintain would support a factual determination of recklessness to support their claim for elder abuse, we conclude that summary adjudication of this claim is appropriate. Our independent review of Dr. Hadian's declaration demonstrates that she concluded that the following conduct by the nurses amounted to "reckless" conduct or a "deliberate disregard" for Brenner's health and safety: (a) "not promptly seeking to start the insulin drip"; (b) "leaving Mr. Brenner's blood sugar levels so dangerously high, without intervention, or without seeking an effective treatment plan from a physician in order to intervene"; (c) "not documenting such a serious complication in [Brenner's] chart [regarding Dr. Hadian's opinion that Dr. Lee had punctured Brenner's carotid artery during the central line placement procedure]"; and (d) "consciously deciding not to take action for such an extended period of time that potentially could result in a cardiopulmonary arrest is akin to reckless conduct [regarding the management of Brenner's 'respiratory distress' for a 24 hour time period between June 9, 2012 and June 10, 2012]."

We take these evidentiary statements in order. With respect to the contention that nurses did "not promptly seek[ ] to start the insulin drip," Dr. Hadian asserts that after the "orders were given to start the insulin drip on June 7, 2012, which required Mr. Brenner to be transferred back to the ICU, the nursing staff delayed for at least 8 hours to transfer Mr. Brenner and start the insulin drip." Dr. Hadian's conclusory assertion that the timing of Brenner's transfer was a result of "nursing staff" decisions is not supported by any reference to evidence from the medical records on which she bases her opinions. Further, even though Dr. Hadian asserts that this delay "could cause serious health consequences,

39

or even death," she does not conclude that this specific incident *did* result in any serious health consequence to Brenner. At most, Dr. Hadian concluded that "the sustained dangerously high blood sugar levels further impeded [Brenner's] healing process, and caused Mr. Brenner additional problems for his body to cope with, which was already under great stress." This is insufficient to create an issue of fact with respect to whether this conduct resulted in actual physical harm, pain, or mental suffering to Brenner.

With respect to Dr. Hadian's conclusion that the nurses at Inland Valley Medical Center engaged in reckless conduct by "leaving Mr. Brenner's blood sugar levels so dangerously high, without intervention, or without seeking an effective treatment plan from a physician in order to intervene," as the trial court noted, the law limits the scope of practice of nurses and requires that they implement treatments ordered by physicians and not practice medicine themselves. (See Bus. & Prof. Code, §§ 2725 [describing scope of nursing practice], 2726 [nurses not authorized to practice medicine or surgery].) The medical records on which the experts based their opinions demonstrate that Brenner was seen by physicians daily throughout his stay at Inland Valley Medical Center. There is nothing in the medical records that would support Dr. Hadian's suggestion that Brenner's blood sugar levels were not known to the treating physicians, or that the nurses failed to follow these physician's orders, or that the nurses may be held legally responsible for not seeking a different treatment plan from that indicated by the treating physicians. Further, Dr. Hadian does not opine that Brenner's blood sugar levels during his stay actually caused him any identified physical harm, pain, or mental suffering. Again, Dr. Hadian concluded, with respect to the blood sugar levels, only that "the sustained dangerously

40

high blood sugar levels further impeded [Brenner's] healing process, and caused Mr. Brenner additional problems for his body to cope with, which was already under great stress."

With respect to Dr. Hadian's conclusion that a nurse was reckless in "not documenting such a serious complication in [Brenner's] chart," in reference to Dr. Hadian's conclusion that Dr. Lee had punctured Brenner's carotid artery during the central line placement procedure, Dr. Hadian's opinion is again fundamentally problematic. Dr. Hadian has no personal knowledge as to whether, even if one presumes that Dr. Lee did puncture the carotid artery, the nurse was aware that a puncture had occurred. Dr. Hadian's opinion assumes that certain things occurred in the room that day, but the medical records do not support these assumptions. More importantly, Dr. Hadian does not state anywhere in her declaration that the nurse's conduct with respect to "not documenting" any carotid artery puncturing *caused* Brenner physical harm, pain, or mental suffering.

Finally, we conclude that Dr. Hadian's determination that the nurses "consciously deciding not to take action [with respect to Brenner's 'respiratory distress'] for such an extended period of time [i.e., between June 9, 2012 and June 10, 2012] that potentially could result in a cardiopulmonary arrest is akin to reckless conduct" is insufficient to avoid summary adjudication of the elder abuse cause of action. Again, Dr. Hadian does not state that this "reckless conduct" actually resulted in cardiopulmonary arrest or otherwise caused Brenner physical harm, pain, or mental suffering. Rather, she states that such conduct "could result in a cardiopulmonary arrest." Thus, Dr. Hadian's

41

declaration is insufficient to create a triable issue of fact with respect to the elder abuse cause of action based on the alleged conduct by the nurses at Inland Valley Medical Center.

We therefore conclude that the trial court property granted summary adjudication of the elder abuse cause of action in favor of UHS.

B. *Given that the trial court properly granted summary judgment in favor of the defendants on appeal, we need not consider plaintiffs' final contention, related to an earlier ruling by the trial court*

Prior to the defendants moving for summary judgment, the plaintiffs moved to amend the first amended complaint to add a request for punitive damages pursuant to Code of Civil Procedure section 425.13, subdivision (a). This statutory provision requires a plaintiff to seek leave of court before being permitted to request punitive damages arising from the alleged professional negligence of a healthcare provider. (Code Civ. Proc., § 425.13, subd. (a).)[15] In order to obtain leave of court to amend the pleading to include a request for punitive damages, a plaintiff must file supporting affidavits showing a substantial probability that the plaintiff will prevail on the request for punitive damages pursuant to section 3294 of the Civil Code. (Code Civ. Proc., § 425.13, subd. (a).) Section 3294 of the Civil Code, in turn, permits exemplary damages only where

---

[15]     "The legislative intent in enacting section 425.13 was to provide a pretrial hurdle to punitive damages claims against health care providers . . . '[T]he Legislature added section 425.13 . . . due to . . . policy concerns " 'that unsubstantiated claims for punitive damages were being included in complaints against health care providers.' " [Citations.] The effect of section 425.13 is to add additional protections against such claims, " 'by establishing a pretrial hearing mechanism by which the court would determine whether an action for punitive damages could proceed.' " ' " (*Cryolife, Inc. v. Superior Court* (2003) 110 Cal.App.4th 1145, 1157–1158.)

42

"[i]n an action for the breach of an obligation not arising from contract, . . . it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice."  Thus, an award of punitive damages "requires *both* a tort action *and* a finding of 'oppression, fraud, or malice.' " (*Myers Building Industries, Ltd. v. Interface Technology, Inc.* (1993) 13 Cal.App.4th 949, 961.)

The trial court denied the plaintiffs' motion to amend to add a request for punitive damages pursuant to Code of Civil Procedure section 425.13, subdivision (a).  Plaintiffs contend on appeal that the court erred in denying them leave to amend the operative complaint to seek punitive damages against the defendants.

Given our conclusion that the trial court properly granted summary judgment with respect to all of the claims asserted against the defendants involved in this appeal, there are no remaining substantive tort claims that could provide the "tort action" to form the basis for a punitive damage award.  We therefore need not consider whether the trial court erred in denying the motion to amend the operative pleading to seek punitive damages.

IV.

DISPOSITION

The judgments are affirmed as to defendants UHS and Lee.


AARON, J.

WE CONCUR:

HUFFMAN, Acting P. J.

HALLER, J.