Filed 5/13/25  N.R. v. Dhawan CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| N.R., a Minor, etc., et al.,<br><br>    Plaintiffs and Appellants,<br><br>        v.<br><br>ARCHANA N. DHAWAN, et al.,<br><br>    Defendants and Respondents. | F086784<br><br>(Super. Ct. No. 18CECG03131)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Jeffrey Y. Hamilton, Jr., Judge.

Jeremy M. Dobbins for Plaintiffs and Appellants.

McNamara, Ambacher, Wheeler, Hirsig & Gray, Denise Billups-Slone and Maria Zhurnalova-Juppunov for Defendant and Respondent Archana D. Dhawan.

J Supple Law, John L. Supple, Robert R. Deering, Dayna F. Olson, Robert D. Sanford and Matthew Schroeder for Defendants and Respondents Covenant Care Morgan Hill, LLC and Elevate Home Health, LLC.

-ooOoo-

Plaintiff N.R. was riding her bicycle when she was hit by a truck driven by an 84-year-old man recovering from major surgery and taking prescription medications that

impaired his ability to drive safely. Plaintiff, through her guardian ad litem, filed a negligence action against three doctors, a skilled nursing facility, and a home health agency that provided care to the truck driver, alleging they failed to warn him not to drive and failed to report his condition to the appropriate authorities. One doctor, the skilled nursing facility, and the home health agency moved for judgment on the pleadings. The trial court granted the motion, concluding those defendants did not owe a duty of care to the plaintiff.

On appeal, plaintiff contends she adequately alleged the defendant health care providers had a special relationship with the truck driver, who was or had been their patient; they owed a duty of reasonable care to the truck driver, which included a duty to warn him not to drive; and that duty of reasonable care extended to foreseeable victims of the danger posed by his driving a vehicle.

We conclude the doctor had a special relationship with the truck driver, her patient, when she prescribed the medications. As a result, the doctor had a duty to warn the truck driver when the prescription was given that the medications rendered driving a vehicle dangerous to himself and others. (See *Tarasoff v. Regents of University of California* (1976) 17 Cal.3d 425, 436 (*Tarasoff*).) Even though the accident occurred about seven weeks after the doctor prescribed the medications without providing a warning, we cannot conclude at the pleading stage that (1) the duty to warn was not breached or (2) any breach was not a proximate cause of the accident. To illustrate why it is inappropriate to dismiss this case at the pleading stage, we note the possibility of the truck driver testifying he would not have driven while taking the prescribed medications if he had been given a clear warning by the prescribing doctor.

We also conclude the licensed skilled nursing facility and the licensed home health agency had a special relationship with the truck driver while he was in their care. That relationship, however, did not give rise to a duty to warn him not to drive or to restrain him from driving.

2.

Lastly, plaintiff's allegations do not support the theory of negligence per se. The facts alleged do not establish a violation of the mandatory reporting requirements of a statute, such as Health and Safety Code section 103900. The statute's discretionary reporting provisions do not provide the basis for a negligence per se claim.

We reverse the judgment in favor of the doctor and affirm the judgment in favor of the skilled nursing facility and home health agency.

## FACTS[1]

Defendant Ray Nazarikangarlu (Patient) was 84 years old when he collided with plaintiff. He was self-employed, owned a Ford E450 commercial box truck, and resided in Morgan Hill, California. He would drive the truck from Morgan Hill to Fresno, pick up produce, haul it back to Morgan Hill, and sell it. In 2018,[2] Patient had significant health problems that required hospitalization.

On June 3, Patient was transferred from St. Louise Hospital to O'Connor Hospital, where a complex surgery would be performed. During Patient's stay at O'Connor Hospital, defendant hospitalist Archana N. Dhawan, M.D., was the attending physician responsible for his medical care.

On June 5, defendant Mohammadreza Rohaninejad, M.D., performed the surgery, removing Patient's gallbladder and repairing a hernia. After the surgery, Patient was physically weak, mentally diminished, not capable of managing his daily activities, and not capable of operating machinery or an automobile. On June 8, Patient was discharged from O'Connor Hospital and, pursuant to arrangements made by Dr. Dhawan, was transferred to a skilled nursing facility for rehabilitation.

---

[1] The facts are taken from plaintiff's operative pleading. When reviewing a grant of judgment on the pleadings and determining whether plaintiff has stated a cause of action, we accept as true the pleading's allegations of fact. (See *Angelucci v. Century Supper Club* (2007) 41 Cal.4th 160, 166; *Stevenson v. Superior Court* (1997) 16 Cal.4th 880, 885.)

[2] All dates are in 2018 unless otherwise designated.

3.

At the time of discharge, Dr. Dhawan prescribed several medications that could inhibit Patient's ability to operate a motor vehicle, including Norco (hydrocodone-acetaminophen), extended release Nifedipine, and Zofran (ondansetron). Dr. Dhawan knew the prescriptions would not be filled until after Patient was discharged from the skilled nursing facility. Dr. Dhawan did not warn Patient not to drive after taking the prescribed medications, despite being his attending hospitalist physician who was responsible for providing applicable warnings upon his discharge from the hospital. Patient's prescriptions were not filled until after July 5.

Neither Dr. Rohaninejad or Dr. Dhawan ever sent a confidential morbidity report to the county health officer or the Department of Motor Vehicles (DMV) regarding Patient's inability to drive safely. That inability was due to his diminished mental and physical capacity after the abdominal surgery and the potential side effects of the medications he was prescribed.

*Skilled Nursing Facility*

On June 8, Patient was admitted to a skilled nursing facility,[3] defendant Covenant Care Morgan Hill, LLC, doing business as Pacific Hills Manor (Pacific Hills). Its responsibility was to rehabilitate Patient after his surgery. Abdelsalam Mogasbe, M.D., was an attending physician while Patient was in the care of Pacific Hills. Pacific Hills' staff, including Dr. Mogasbe, never assessed Patient's ability to operate a motor vehicle despite his obvious poor balance, weakness, and poor cognition. Also, Pacific Hills' staff never performed a discharge assessment, which allowed Patient to be improperly and

---

[3] " 'Skilled nursing facility' means a health facility that provides skilled nursing care and supportive care to patients whose primary need is for availability of skilled nursing care on an extended basis." (Health & Saf. Code, § 1250, subd. (c)(1).) A skilled nursing facility, like other health facilities, must obtain a license from the State Department of Public Health before beginning operations. (Health & Saf. Code, § 1253, subd. (c)(1); see *California Advocates for Nursing Home Reform v. Aragon* (2021) 60 Cal.App.5th 500, 504.)

unsafely discharged from the facility. Pacific Hills and Dr. Mogasbe did not warn him not to drive and did not send a confidential morbidity report to the DMV regarding his inability to operate a motor vehicle safely. Plaintiff alleges, on information and belief, that Patient was not in a condition to understand any such warning and was mentally unable to consent to being discharged. Once discharged by Pacific Hills, Patient went home where he received care from a home health agency.[4]

*Home Health Agency*

Defendant Elevate Home Health, LLC, doing business as Focus Home Health, provided Patient with home healthcare after his discharge from Pacific Hills. Its staff first visited Patient at his home on June 21 and made their last visit on August 8. Focus Home Health was responsible (1) for rehabilitating Patient so he could regain the ability to live on his own and (2) for making efforts to ensure he received the care needed to protect his wellbeing. The staff of Focus Home Health documented that (1) Patient lived in substandard conditions with vermin, no running water, and no heating or cooling; (2) he had a weak, unsteady gait and was unable to provide for his basic daily activities; (3) he stated multiple times that he was going to be cleared to drive by Dr. Rohaninejad (his surgeon) and mentioned driving to Fresno; and (4) he once said Dr. Rohaninejad gave him the okay to start driving soon and that he would be driving to Fresno. Nonetheless, staff did not evaluate Patient's ability to operate a motor vehicle, did not warn him not to drive, and did not discuss his ability or lack of ability to drive safely with Dr. Rohaninejad.

---

[4] " 'Home Health Agency' " is defined as an organization that "provides, or arranges for the provision of, skilled nursing services, to persons in their temporary or permanent place of residence." (Cal. Code Regs., tit. 22, § 74600, subd. (a).) A home health agency must obtain a license from the State Department of Public Health before beginning operations. (Cal. Code Regs., tit. 22, § 74659; see Bus. & Prof. Code, § 4027, subd. (c) [" 'licensed home health agency' means a private or public organization licensed by the State Department of Public Health"].)

*The Accident*

On July 20, at approximately 6:35 p.m., plaintiff was riding her bicycle eastbound on the asphalt shoulder of Millerton Road toward its intersection with Sky Harbour Road. At that time, Patient was driving his box truck eastbound on Millerton Road, sometimes swerving into the westbound lane or across the white line marking the border between the eastbound lane and its asphalt shoulder. His driving privileges were partially suspended, but he was permitted to drive for employment purposes.[5] As Patient overtook plaintiff, he swerved onto the asphalt shoulder and his truck struck plaintiff and her bicycle. Patient was charged at the scene with driving without a license (Veh. Code, § 12500, subd. (a)) and driving without proof of insurance (Veh. Code, § 16028, subd. (c)), but was allowed to leave on his own. Patient stated to officers that he was going to Table Mountain Casino at the time of the accident.

At the time of the accident, Patient was still in the care of Dr. Rohaninejad and was taking the medications that Dr. Dhawan had prescribed, including Norco, an opiate that impairs mental and physical abilities. Neither doctor had warned Patient not to drive.

Plaintiff suffered a broken pelvis, fractures in her left hand, cracked ribs, a bruised lung, and bleeding in her brain. Her severe cerebral trauma left her comatose for 11 days and unable to breathe without ventilation. Her permanent injuries include cognitive impairment to her memory and weakness to her right arm and right leg.

## PROCEDURAL HISTORY

In August, plaintiff, through her guardian ad litem, initiated this personal injury lawsuit. In December 2022, after demurrers to her earlier pleadings had been sustained with leave to amend, plaintiff filed her third amended complaint, which is the operative pleading in this appeal. Plaintiff asserted a negligence claim against Patient, alleging his

---

[5]    At oral argument, plaintiff's counsel opined that Patient's driving privileges has been restricted for unknown reasons before his hospitalization and accident.

conduct breached the duty of reasonable care.  Plaintiff also asserted a medical negligence claim for relief against defendants Dr. Dhawan, Dr. Rohaninejad, Pacific Hills, Dr. Mogasbe, and Focus Home Health and called them "Medical Providers."  The medical negligence claim asserted:

> "All Medical Providers listed herein had a special relationship with [Patient] that supports affirmative duties for the benefit of third persons.  A doctor and their patient have a special relationship.  A hospital, skilled nursing facility, and a home health medical provider also have a special relationship with their patient that supports the affirmative duties for the benefit of third persons.  Such special relationships require reasonable care to be exercised by all medical providers in this matter including Pacific Hills, Focus Home Health, Dr. Mogasbe, Dr. Dhawan, and Dr. Rohaninejad."

Plaintiff alleged Medical Providers breached three duties owed to her:  (1) a duty to assess Patient's ability to drive, and take reasonable measures to ensure he would not drive, since it was reasonably foreseeable he could harm himself or others by driving; (2) a duty to warn Patient not to drive given his post-surgery condition; and (3) a duty to report to various individuals and entities that Patient was unsafe to drive.  Plaintiff requested general damages, special damages, and other relief.  On an issue of timing, plaintiff alleged Dr. Dhawan was responsible for warning Patient "upon his discharge from O'Connor" Hospital.

In May 2023, Dr. Dhawan filed a motion for judgment on the pleadings.  In July 2023, Pacific Hills and Focus Home Health filed a similar motion.[6]  Defendants argued plaintiff failed to state facts showing that they owed a legal duty to plaintiff (or third parties generally) to assess Patient, issue warnings regarding Patient's condition to drive,

---

[6]     For the remainder of this opinion, we use the word "defendants" to refer to Dr. Dhawan, Pacific Hills, and Focus Home Health collectively.  The other named defendants—Patient, Dr. Rohaninejad, and Dr. Mogasbe—are not parties to this appeal; they did not join the motions for judgment on the pleadings or file a motion of their own.  The proof of service for the third amended complaint listed Patient and Dr. Mogasbe as pro per defendants.

7.

or file a confidential morbidity report about Patient. Alternatively, they argued plaintiff failed to state facts showing any of their acts or omissions were a proximate cause of plaintiff's injuries.

In August 2023, the trial court heard argument on defendants' motions and took the matter under submission. Later that day, the court adopted its tentative ruling to grant the motions for judgment on the pleadings without leave to amend. The court determined plaintiff failed to sufficiently allege the existence of a duty owed by defendants to her. The court rejected defendants' alternate ground that plaintiff had failed to sufficiently alleged causation. On August 15, 2023, the court entered judgment in favor of Dr. Dhawan. On August 18, 2023, the court entered judgment in favor of Pacific Hills and Focus Home Health. Plaintiff timely appealed.

## DISCUSSION

### I. GENERAL PRINCIPLES

#### A. <u>Stating a Cause of Action</u>

A complaint must state "the facts constituting the cause of action, in ordinary and concise language" and must identify the relief claimed, such as money damages. (Code Civ. Proc., § 425.10, subd. (a).) A civil complaint serves a variety of purposes, including apprising the defendant of the basis upon which the plaintiff is seeking recovery and framing and limiting the issues. (*Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197, 211–212, superseded on other grounds by statute, as recognized in *Californians for Disability Rights v. Mervyn's, LLC* (2006) 39 Cal.4th 223, 228.) To fulfill these purposes, the "complaint should set forth the *ultimate facts* constituting the cause of action, not the evidence by which plaintiff proposes to prove those facts." (*Committee on Children's Television, Inc.*, *supra*, at p. 212, italics added.)

To properly allege a cause of action, the complaint must contain facts that satisfy each of the essential elements of the cause of action. (*Foster v. Sexton* (2021) 61

8.

Cal.App.5th 998, 1018.) Those "elements are determined by the substantive law that defines the cause of action." (*Ibid.*) California law defines the generic elements of a tort claim as "wrongdoing, causation, and harm." (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 807.) The specific "elements of a negligence cause of action are (1) the existence of a duty, (2) a breach of that duty, (3) injury to the plaintiff caused by the defendant's breach, and (4) actual damages." (*Romero v. Los Angeles Rams* (2023) 91 Cal.App.5th 562, 567.) Similarly, the specific "elements of a cause of action for professional negligence are (1) the existence of the duty of the professional to use such skill, prudence, and diligence as other members of the profession commonly possess and exercise; (2) breach of that duty; (3) a causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional negligence." (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 821.)

### B. Motion for Judgment on the Pleadings

When a "complaint does not state facts sufficient to constitute a cause of action against [a] defendant," (Code Civ. Proc., § 438, subd. (c)(1)(B)(ii)) the defendant "may move for judgment on the pleadings" on that ground (Code Civ. Proc., § 438, subd. (b)(1)). Such motions may be directed to "[t]he entire complaint … or as to any of the causes of action stated therein." (Code Civ. Proc., § 438, subd. (c)(2)(A).) "If the motion is granted with respect to the entire complaint … without leave to file an amended complaint …, then judgment shall be entered forthwith in accordance with the motion granting judgment to the moving party." (Code Civ. Proc., § 438, subd. (h)(3).)

"A motion for judgment on the pleadings is similar to a demurrer in most respects." (*Alameda County Waste Management Authority v. Waste Connections US, Inc.* (2021) 67 Cal.App.5th 1162, 1173.) "Except as provided in the statute governing motions for judgment on the pleadings, Code of Civil Procedure section 438, the rules

9.

governing demurrers apply." (*Id*. at p. 1174.) Pleading defects may be disclosed on the face of the pleading or by matters subject to judicial notice. (*Ibid*.)

Whether a pleading alleges facts sufficient to state a cause of action is a question of law. (*Foster v. Sexton*, *supra*, 61 Cal.App.5th at p. 1019.) Applying the general rule that a trial court's conclusions of law are subject to de novo review (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711–712), appellate courts reviewing an order granting a motion for judgment on the pleadings must independently determine whether a cause of action has been stated. (*Mendoza v. Continental Sales Co*. (2006) 140 Cal.App.4th 1395, 1401.)

C.    Lower Court's Prior Rulings Are Irrelevant

Plaintiff contends the trial judge who granted the motions for judgment on the pleading ignored the ruling of the first judge assigned to the case and, as a result, effectively acted as a one-judge appellate court on the issues. Plaintiff claims this error justifies reversal of the judgments entered against her. We disagree.

Under the applicable standard of review, this court is obligated to conduct an independent review and decide whether the third amended complaint stated, "facts sufficient to constitute a cause of action against [the] defendants." (Code Civ. Proc., § 438, subd. (c)(1)(B)(ii).) When conducting this independent review, "we review the correctness of the lower court's decision, not its rationale." (*Gilbert v. State of California* (1990) 218 Cal.App.3d 234, 240, fn. 4, citing *Davey v. Southern Pacific Co.* (1897) 116 Cal. 325, 329 ["ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason"].)

Plaintiff's argument that the second trial judge ignored earlier rulings addresses that judge's rationale and not his ultimate decision. As a result, the argument is irrelevant to our independent review, which addresses whether plaintiff has alleged facts sufficient to constitute a cause of action.

II.      DUTY TO THIRD PARTIES BASED ON A SPECIAL RELATIONSHIP

Plaintiff contends she adequately pleaded a cause of action for negligence.  She alleges each defendant had a duty to warn Patient not to drive but failed to do so.  She alleges that duty arose because (1) each defendant had a special relationship with Patient and (2) Patient was obviously in no condition to safely drive a vehicle and, with respect to Dr. Dhawan, she prescribed Patient medications that impair driving ability.  We conclude plaintiff adequately pleaded a cause of action for negligence against Dr. Dhawan but not against Pacific Hills and Focus Home Health.

A.      Basic Legal Principles

In a negligence cause of action, the elements of breach, causation, and injury usually are fact-specific issues for the trier of fact.  (*Staats v. Vintner's Golf Club, LLC* (2018) 25 Cal.App.5th 826, 831.)  In contrast, the existence of a duty and its scope are questions of law.  (*Ibid.*; *Kesner v. Superior Court* (2016) 1 Cal.5th 1132, 1142 [duty is a question of law and is reviewed de novo on appeal].)

Duty is the "cornerstone" of every negligence claim.  (*T.H. v. Novartis Pharmaceuticals Corp.* (2017) 4 Cal.5th 145, 163.)  Duties are " 'the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection.' "  (*Dillon v. Legg* (1968) 68 Cal.2d 728, 734.)

The law imposes a general duty upon all conduct.  "Everyone is responsible … for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person."  (Civ. Code, § 1714, subd. (a).)  Thus, "each person has a duty to use ordinary care and 'is liable for injuries caused by his failure to exercise reasonable care in the circumstances.' "  (*Parsons v. Crown Disposal Co.* (1997) 15 Cal.4th 456, 472.)  Notwithstanding this basic duty of care, California law provides that, as a general matter, there is no duty to protect others from the conduct of third parties.  (*Delgado v. Trax Bar & Grill* (2005) 36 Cal.4th 224, 234 (*Delgado*).)

11.

However, "courts have recognized exceptions to the general no-duty-to-protect rule, one of which [is] the 'special relationship' doctrine." (*Id*. at p. 235.)

### B.    Special Relationship Doctrine

The doctrine provides that a defendant may owe a duty to protect the plaintiff from third party conduct if the defendant has a special relationship with *either* the plaintiff *or* the third party. (*Barenborg v. Sigma Alpha Epsilon Fraternity* (2019) 33 Cal.App.5th 70, 76; see *Al Shikha v. Lyft, Inc.* (2024) 102 Cal.App.5th 14, 22; see Rest.2d Torts, § 315.) Here, plaintiff alleges defendants had a special relationship with Patient, not with her. Thus, the following describes the part of the special relationship doctrine relevant to this appeal: "When the avoidance of foreseeable harm to a third person requires a defendant to *control* the conduct of a person with whom the defendant has a special relationship (such as physician and patient) *or* to *warn* the person of the risks involved in certain conduct, the defendant's duty extends to a third person with whom the defendant does not have a special relationship." (*Reisner v. Regents of Univ. of California* (1995) 31 Cal.App.4th 1195, 1198-1199, italics added (*Reisner*); see *Tarasoff*, *supra*, 17 Cal.3d at p. 435.)

The duty extended to third persons by the special relationship doctrine has been described by the Supreme Court in various ways. In *Brown v. USA Taekwondo* (2021) 11 Cal.5th 204 (*Brown*), the court referred to "an affirmative duty to protect." (*Id*. at p. 215.) A few years earlier, the court had referred to a "duty to control, warn, or protect." (*Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 619.) In this opinion, we use the term "duty to protect" in a broad sense and use the terms "duty to control" and "duty to warn" to describe more specific duties that fall under the umbrella of the duty to protect third persons from the dangers posed by a person with whom a defendant has a special relationship.

12.

Our Supreme Court has developed a two-step inquiry for determining whether to impose a duty to protect for the benefit of a third party. "First, the court must determine whether there exists a special relationship between the parties or some other set of circumstances giving rise to an affirmative duty to protect." (*Brown, supra,* 11 Cal.5th at p. 209.) "The existence of such a special relationship puts the defendant in a unique position to protect the plaintiff from injury. The law requires the defendant to use this position accordingly." (*Ibid*.)[7] Second, if special relationship exists, the court must consult the factors described in *Rowland v. Christian* (1968) 69 Cal.2d 108 (*Rowland*) to determine whether relevant policy considerations support limiting the duty to protect. (*Brown*, *supra*, at p. 209.)

## C.     Dr. Dhawan's Duty

### 1.     The Doctor-Patient Special Relationship

The first step of the test is easily resolved as to Dr. Dhawan. California courts have determined "[a] 'special relationship' exists between a doctor and a patient." (*Myers v. Quesenberry* (1983) 144 Cal.App.3d 888, 892 (*Myers*), citing *Tarasoff*, *supra*, 17 Cal.3d 425, 436; see also *Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 310 (conc. opn., Kaufman, J.); *Elsheref v. Applied Materials, Inc.* (2014) 223 Cal.App.4th 451, 461 [quoting *Tarasoff*].) " 'Such a relationship may support affirmative duties for the benefit of third persons.' " (*Myers*, *supra*, at p. 892, quoting *Tarasoff*, *supra*, at p. 436, fns. omitted.)

Here, Dr. Dhawan concedes doctors and patients have a special relationship under California law and, at one point, such a relationship existed between her and Patient. She

---

[7]     Examples of special relationships acknowledged by the Supreme Court include (1) proprietors and their tenants, patrons, or invitees; (2) common carriers and passengers; (3) innkeepers and their guests; (4) mental health professionals and their patients; (5) parents and children; (6) colleges and students; and (7) employers and employees. (*Brown*, *supra*, 11 Cal.5th at p. 216; *Delgado*, *supra*, 36 Cal.4th at p. 236, fn. 14.)

13.

contends, however, she cannot be liable because the special relationship terminated upon Patient's discharge into a skilled nursing facility. She contends the issue presented should be framed as follows:

> "Did Dr. Dhawan owe a duty for the benefit of [plaintiff] to warn her former patient … against driving *after* Dr. Dhawan discharged him to recover as inpatient to a skilled nursing facility under the care of different medical providers?"

This description of the issue is unduly narrow. By limiting the issue to warnings *after* Patient's discharge from O'Connor Hospital, Dr. Dhawan failed to address whether a duty to warn existed and was breached *before* Patient's discharge and transfer to a skilled nursing facility. This omission is significant because one of plaintiff's theories of liability is that Dr. Dhawan prescribed Patient medications that impair driving ability and failed to warn Patient of that danger at any time before the end of their doctor-patient relationship when Patient was discharge from the hospital.[8]

In analyzing this theory of liability, we reach the following conclusions. First, a special relationship existed between Dr. Dhawan and Patient that coincided with the existence of the doctor-patient relationship. (See *Tarasoff*, *supra*, 17 Cal.3d at p. 436; *Myers*, *supra*, 144 Cal.App.3d at p. 892.) Second, while the doctor-patient relationship existed, Dr. Dhawan had a duty "to exercise reasonable care to protect the foreseeable victim" of the danger posed by the patient. (*Tarasoff*, *supra*, at p. 439.) Third, in determining whether this duty to protect third parties has been met or breached, the adequacy of the physician's "conduct must be measured against the traditional negligence standard of the rendition of reasonable care under the circumstances." (*Tarasoff*, *supra*, at p. 439.) Fourth, the duty to protect third parties includes a duty to warn patients who

---

[8]    Dr. Dhawan's argument that there is no authority holding a physician "has a never-ending special relationship with a patient who has been discharged from her care" is irrelevant because this theory of liability based on a duty to protect does not depend on a never-ending special relationship.

14.

are prescribed medications that impair the ability to drive safely of that danger. " 'A doctor must … warn a patient if the patient's condition or medication renders certain conduct, such as driving a car, dangerous to others.' " (*Myers*, *supra*, at p. 892, quoting *Tarasoff*, *supra*, at p. 436, fn. omitted.) Next, we address the second step of the special relationship doctrine.

### 2. The Rowland Factors

The analysis of the *Rowland* factors "was not designed as a freestanding means of establishing duty, but instead as a means for deciding whether to limit a duty derived from other sources." (*Brown*, *supra*, 11 Cal.5th at p. 217.) The *Rowland* factors are: "[1] the foreseeability of harm to the plaintiff, [2] the degree of certainty that the plaintiff suffered injury, [3] the closeness of the connection between the defendant's conduct and the injury suffered, [4] the moral blame attached to the defendant's conduct, [5] the policy of preventing future harm, [6] the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and [7] the availability, cost, and prevalence of insurance for the risk involved." (*Rowland*, *supra*, 69 Cal.2d at p. 113.)

The factors fall into two categories: (1) "[t]hree factors—foreseeability, certainty, and the connection between the plaintiff and the defendant—address the foreseeability of the relevant injury," and (2) "the other four— moral blame, preventing future harm, burden, and availability of insurance—take into account public policy concerns that might support excluding certain kinds of plaintiffs or injuries from relief." (*Kesner v. Superior Court*, *supra*, 1 Cal.5th at p. 1145.) "Foreseeability and the extent of the burden to the defendant are ordinarily the crucial [*Rowland*] considerations, but in a given case one or more of the other *Rowland* factors may be determinative of the duty analysis." (*Castaneda v. Olsher* (2007) 41 Cal.4th 1205, 1213.)

Some of Dr. Dhawan's arguments about foreseeability and the *Rowland* public policy factors are based on the *specific* facts of this case. These arguments miss the point because the *Rowland* factors are applied to a category of cases, not " 'the facts of the particular case before us.' " (*Kesner v. Superior Court*, *supra*, 1 Cal.5th at pp. 1143–1144.) Put differently, the analyses under *Rowland* and *Biakanja v. Irving* (1958) 49 Cal.2d 647 (*Biakanja*)[9] are meant to evaluate a broad class of cases. (*QDOS, Inc. v. Signature Financial, LLC*, *supra*, 17 Cal.App.5th at p. 999 ["[w]hether a court uses the *Biakanja* factors, the *Rowland* factors, or an amalgamation of both, the 'factors are evaluated at a relatively broad level of factual generality' "].) Thus, when addressing "foreseeability" under *Rowland*, our task is " ' "is not to decide whether a *particular* plaintiff's injury was reasonably foreseeable in light of a *particular* defendant's conduct, but rather to evaluate more generally whether the category of negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that liability may appropriately be imposed." ' " (*Kesner v. Superior Court*, *supra*, at p. 1145.)

Consequently, our analysis of foreseeability under the *Rowland* test is different from that conducted by a trier of fact who "considers 'foreseeability' in two more focused, fact-specific settings. First, the jury may consider the likelihood or foreseeability of injury in determining whether, in fact, the particular defendant's conduct was negligent in the first place. Second, foreseeability may be relevant to the jury's determination of whether the defendant's negligence was a proximate or legal cause of the plaintiff's injury." (*Ballard v. Uribe* (1986) 41 Cal.3d 564, 572, fn. 6.)

---

[9]     *Biakanja* enumerated a six-factor analysis applied in the context of business transactions that is similar to the seven-factor *Rowland* analysis applied in tort cases. (See *QDOS, Inc. v. Signature Financial, LLC* (2017) 17 Cal.App.5th 990, 999 [comparing *Rowland* and *Biakanja* tests].)

16.

### 3. *Foreseeability and the Temporal Connection*

Dr. Dhawan argues the foreseeability related factors weigh heavily against imposing a duty on physicians to protect members of the driving public against harm from their former patients weeks and months after the physicians discharge a patient from post-surgery care. She asserts a physician who attended a patient during a brief hospital stay for surgery has no way to foresee whether and when the patient, who has been transferred to a skilled nursing facility for rehabilitation, may be considered safe or unsafe to drive a vehicle.

These broadly phrased arguments are not convincing in the specific context of the foreseeability of the danger to the motoring public posed by a patient driving while taking prescribed medications that impair the ability to drive. The passage of time and intervening care does not eliminate or significantly reduce the foreseeability of the danger posed by medications that impair the ability to drive. Simply put, the danger arises when the patient takes the medication and then drives. The foreseeability of that danger does not fade with the passage of time between when the medication was prescribed and when it is taken. In *Coombes v. Florio* (Mass. 2007) 877 N.E.2d 567, the concurring opinion of Justice Ireland stated:

> "When a doctor prescribes medication it is both a foreseeable and intended result that a patient will take the medication. The occurrence of known side effects, and the impact of such side effects on the patient's ability to drive, are foreseeable results of that prescription. Furthermore, the inability of a doctor to control the conditions under which his patient takes prescribed drugs is not determinative where, as here, the plaintiff contends only that the doctor owed a duty to warn." (*Id.* at p. 573.)

An example of a case lacking a close temporal connection between the breach of the duty to warn and the injury to a foreseeable third party is *Reisner, supra,* 31 Cal.App.4th 1195. There, a 12-year-old girl received a blood transfusion contaminated with HIV antibodies. (*Id.* at p. 1197.) The girl's doctor discovered that fact the next day, but never told the girl or her parents of the tainted blood. He continued to treat her when

17.

she was a teenager.  Three years after the transfusion, she began dating the plaintiff and, at some point, they became intimate.  Five years after the transfusion, the girl was diagnosed as having AIDS and she passed away.  Before she died, she told her boyfriend of the diagnosis and, after he was tested, he learned he was HIV positive.  The boyfriend sued the doctor.  (*Id*. at pp. 1197–1198.)  The trial court granted the doctor's motion for judgment on the pleadings, concluding they owed no duty to an unidentifiable third party.  (*Id*. at p. 1198.)

The appellate court in *Reisner* reversed, concluding the defendants owed a duty to warn the girl and her parents of the danger as "a reasonable step to take in the exercise of the standard of care applicable to physicians."  (*Reisner*, *supra*, 31 Cal.App.4th at p. 1200.)  The court rejected the doctor's argument that there needed to be an " 'immediate temporal connection' " between the alleged negligent act and the injury.  (*Id*. at p. 1201.)  The court stated such analysis begged the question.  As the doctor maintained a physician-patient relationship with the girl and knew or reasonably should have known that, as she matured, she was likely to enter an intimate relationship, the injury to the boyfriend was foreseeable.  (*Ibid*.)

In *Reisner*, the special relationship still existed between the doctor and the girl when the boyfriend contracted the disease and sustained the injury.  (*Reisner*, *supra*, 31 Cal.App.4th at p. 1201.)  Nonetheless, *Reisner* illustrates that temporal proximity between the breach and the injury is not essential for the injury to be foreseeable.  The breach of the duty to warn in *Reisner* occurred when the doctor knew of the tainted transfusion but did not inform the girl and her family.  That breach was years before the boyfriend's injury.  (Cf. *Estate of Amos v. Vanderbilt University* (Tenn. 2001) 62 S.W.3d 133, 138 [hospital owed duty to warn a former patient that blood transfusion possibly exposed her to the HIV virus; award of damages to patient's husband upheld even though he was not married to patient when the transfusion was given or when his expert witness testified hospital should have notified recipients of the tainted blood].)

18.

Here, Patient's truck struck plaintiff on July 21 and the failure to warn him that the medication impaired the ability to drive occurred about 43 days earlier when the medications were prescribed (i.e., around the time of Patient's June 8 discharge from O'Connor Hospital). The passage to time did not render the danger of impaired driving unforeseeable and, therefore, the passage of time does not weigh against imposing a duty to warn of the medications' effects on the ability to drive. Thus, we conclude foreseeability weighs in favor of recognizing that, when a prescription is given, the prescribing doctor has a duty to warn the patient of the dangers of its side effects. Next, we analyze whether policy considerations weigh in favor of limiting this duty.

### 4. Limits on the Duty—Policy Considerations

Dr. Dhawan argues the *Rowland* public policy factors of moral blame, burden, and availability of insurance favor concluding she had no duty to warn. She does not address the factor of preventing future harm.

We conclude the policy consideration of preventing future harm favors imposing a duty to warn for the benefit of third parties. (*McKenzie v. Hawaii Permanente Medical Group, Inc.* (2002) 98 Hawai'i 296, 306 (*McKenzie*) ["[i]t appears obvious that warning a patient not to drive because his or her driving ability may be impaired by a medication could potentially prevent significant harm to third parties"]; *Coombes*, *supra*, 877 N.E.2d at p. 573 ["the benefits of such warnings are significant," and "protect the public from the very harm that creates the parallel duty to the patient, the foreseeable risk that known side effects of a drug will impair a patient's ability to drive"].)

Dr. Dhawan contends no moral blame can be imputed to her because she did nothing but act in good faith in providing in-hospital medical care and treatment to Patient and in appropriately referring him to a skilled nursing facility for rehabilitation as an in-patient. We disagree. Under California law, physicians (not drug manufacturers) are responsible for warning patients of the dangers posed by taking a prescribed

19.

medication. (See *Himes v. Somatics, LLC* (2024) 16 Cal.5th 209, 221–222 [under the learned intermediary doctrine, a drug manufacturer fulfills its duty to warn by providing appropriate warnings to the doctor; the doctor has the duty of warning the patient].) Based on this allocation of the duty to warn, we reject the argument that Dr. Dhawan was morally blameless in failing to warn Patient that the medications she prescribed would impair his ability to drive safely.

In addressing the burden factor, we consider both the burden on physicians and the burden on society. The burden on physicians of fulfilling a duty to warn for the benefit of the driving public is relatively small because the physician already owes the patient a duty to warn about the dangers of the prescribed medication. (*McKenzie, supra,* 98 Hawai'i at p. 307; see Hodge, *The Liability of Health Care Providers to Third Parties Injured by a Patient* (2021) 41 Pace L.Rev. 464, 486 [informing patients of the risks related to taking medications while operating a vehicle presents little or no burden upon prescribing doctor].) Dr. Dhawan also argues imposing a duty would impose a burden on society because of (1) the chilling effect on physicians' ability to practice medicine and (2) the increased likelihood that patients would be discharged without medications. The possibility of this happening appears slight because the alternate approach of prescribing medication and providing a warning is not onerous. In our view, the argument about impacting physicians' ability to practice medicine is better suited to imposing liability for negligently prescribing medication, which is distinct from imposing liability for negligently failing to warn. (See *Burroughs v. Magee* (Tenn. 2003) 118 S.W.3d 323, 331–333 (*Burroughs*) [doctor did not owe a duty to members of motoring public in making his decision to prescribe two drugs to the patient]; *McKenzie*, *supra*, at p. 305 [physician did not owe a duty to nonpatient injured in an automobile accident caused by the patient's adverse reaction to a negligently prescribed medication].)

Dr. Dhawan contends the potential of unlimited liability imposed on medical providers for patients discharged from their care will likely lead to a substantial increase

in the cost of medical liability insurance.  We reject this argument because, nearly 50 years ago, the Supreme Court gave the following example of an affirmative duty for the benefit of third parties:  "A doctor must also warn a patient if the patient's condition or medication renders certain conduct, such as driving a car, dangerous to others." (*Tarasoff*, *supra*, 17 Cal.3d at p. 436.)  Even though "dictum in the *Tarasoff* context" (*Myers*, *supra*, 144 Cal.App.3d at p. 892), it is highly probable the insurance industry in California has considered the statement and established premiums for medical malpractice insurance that covers the risk of this potential liability to nonpatients. Further notice was provided to the insurance industry by *Myers*' broad statement that "[w]hen a physician furnishes medicine causing drowsiness, he should warn his patient not to drive or engage in other activities which are likely to cause injury."  (*Myers*, *supra*, at p. 894.)  The statement goes beyond those made in *Tarasoff* by identifying *when* the warning is to be given.

Consequently, we conclude the public policy factors listed in *Rowland* favor extending to third parties the benefit of a physician's duty to warn a patient that a prescription medication renders driving a motor vehicle dangerous.  We recognize some jurisdictions have adopted the same approach, others have limited the duty to warn to medications administered directly by the physician, and still others have imposed no duty to warn for the benefit of third parties.  (See Hodge, *The Liability of Health Care Providers to Third Parties Injured by a Patient*, *supra*, 41 Pace L.Rev. at pp. 486 [listing cases from Alabama, Hawaii, Indiana, New York, South Carolina, Tennessee, and Utah as having allowed recovery and cases from Connecticut, Florida, Georgia, Iowa, Kansas, Massachusetts, New Jersey, North Dakota, Oklahoma, Pennsylvania, and Texas having not allowed recovery].)  Based on our analysis of the *Rowland* factors, we agree with the position stated in *Tarasoff*'s dictum, repeated in *Myers*, and adopted in *Burroughs*, *supra*, 118 S.W.3d 323, *McKenzie*, *supra*, 98 Hawai'i 296, and *Coombes*, *supra*, 877 N.E.2d 567 (conc. opn. of Ireland, J.).

21.

## 5. *Issues for the Trier of Fact*

Our legal conclusion that physicians have a legal duty to warn patients of the dangers of prescribed medication that extends to foreseeable victims of the danger should not be interpreted as deciding Dr. Dhawan breached that duty. Further, whether Dr. Dhawan's conduct breached that duty "must be measured against the traditional negligence standard of the rendition of reasonable care under the circumstances." (*Tarasoff*, *supra*, 17 Cal.3d at p. 439.) In turn, whether Dr. Dhawan acted reasonably under the circumstances will depend on whether she exercised "such skill, prudence, and diligence as other members of the profession commonly possess and exercise." (*Oasis West Realty, LLC v. Goldman*, *supra*, 51 Cal.4th at p. 821.) In other words, the duty to warn adopted here preserves "for the jury the fact-specific question of whether or not the defendant acted reasonably under the circumstances." (*Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 773.) Circumstances relevant to whether Dr. Dhawan acted reasonably and whether any breach of the duty was an in-fact cause of plaintiff's injuries may include, but are not limited to, whether a warning would have been futile and whether Patient was aware of the risk without a warning.

### D. Duty of Pacific Hills and Focus Home Health

Like Dr. Dhawan, Pacific Hills and Focus Home Health contend plaintiff's allegations fail to establish they owed plaintiff a duty of care. They also raise procedural issues as grounds for affirming the judgment, contending plaintiff did not meet her burden of demonstrating error because the record is incomplete, and her opening brief does not comply with applicable rules. (See *Herrera v. Doctors Medical Center of Modesto* (2021) 67 Cal.App.5th 538, 546 ["Appellants fail to carry the burden of affirmatively demonstrating error if they, among other things, do not provide an adequate record on appeal or do not comply with certain briefing requirements in California Rules of Court, rule 8.204"].) We need not address the procedural issues.

22.

### 1. *Special Relationships with Patient*

Pacific Hills and Focus Home Health contend plaintiff has alleged no facts showing they had a special relationship with either Patient or plaintiff and cite the principle that "a special relationship between the defendant and the dangerous third party is one that 'entails an ability to control [the third party's] conduct.' " (*Brown*, *supra*, 11 Cal.5th at p. 216.)

Our Supreme Court has recognized a special relationship exists between a hospital and its patient. (*Nally v. Grace Community Church, supra,* 47 Cal.3d at p. 293, citing *Meier v. Ross General Hospital* (1968) 69 Cal.2d 420 (*Meier*) and *Vistica v. Presbyterian Hospital* (1967) 67 Cal.2d 465.) The Court of Appeal has concluded a special relationship exists between a licensed residential care facility for the elderly and a patient-resident. (*Klein v. BIA Hotel Corp*. (1996) 41 Cal.App.4th 1133, 1136, 1142 (*Klein*); see Health & Saf. Code, § 1569.10 [license or permit required to operate a residential facility for the elderly].) In support of its conclusion, the appellate court noted that such facilities are governed by title 22, division 6, chapter 8 of the California Code of Regulations and described some of the responsibilities imposed by the regulations. (*Klein*, *supra*, at p. 1136.)

More recently, the Court of Appeal stated: "It is well established that the patient-provider relationship is another example of a 'special relationship.' " (*T.L. v. City Ambulance of Eureka, Inc.* (2022) 83 Cal.App.5th 864, 883 (*City Ambulance*).) In *City Ambulance*, the providers were an ambulance company and the paramedic and the emergency medical technician staffing the ambulance that transported the patient. The court concluded these providers of "medical support services" had a special relationship with the patient and, thus, owed the patient a general duty of care. (*Ibid*.) Because the plaintiff was the patient, the court did not address whether that duty of care extended to third parties.

Here, Pacific Hills is a licensed skilled nursing facility.  Its operations are governed by title 22, division 5, chapter 3 of the California Code of Regulations.  Based on these regulations, the general principle that patient and health care providers have a special relationship (*City Ambulance*, *supra*, 83 Cal.App.5th at p. 883), and the determination that a residential care facility for the elderly has a special relationship with its residents (*Klein*, *supra*, 41 Cal.App.4th at p. 1142), we conclude a skilled nursing facility has a special relationship with patients residing there.

Focus Home Health is a licensed home health agency and its operations are governed by title 22, division 5, chapter 6 of the California Code of Regulations.  Our Supreme Court has stated attempts "to distinguish home health care workers from those employed in institutions are not persuasive ….  Caregivers are hired to protect the patients from harming themselves or others." (*Gregory v. Cott* (2014) 59 Cal.4th 996, 1007 [limiting such duty to professional home health caregivers].)  Consequently, we conclude a home health agency has a special relationship with persons to whom they provide care.

Applying the foregoing legal conclusions to the facts alleged in this case, we conclude (1) Pacific Hills had a special relationship with Patient while he resided at the facility and (2) Focus Home Health had a special relationship with Patient during the time it provided care to him.  Because the staff of Focus Home Health last visited Patient on August 8, its special relationship with Patient existed when the accident occurred in July.

### 2. *The Rowland Factors*

Next, we consider the *Rowland* factors to define the scope of the general duty of care a skilled nursing facility and a home health agency owes to its patient.  (*Tarasoff*, *supra*, 17 Cal.3d at p. 439.)  Here, plaintiff has alleged Pacific Hills and Focus Home Health "failed to warn [Patient] that it was unsafe for him to drive."  In response, the

24.

defendant entities contend their responsibilities do not include diagnosing Patient's ability to drive because that is the responsibility of Patient's physicians. We agree.

The foreseeability factors include "the closeness of the connection between the defendant's conduct and the injury suffered." (*Rowland*, *supra*, 69 Cal.2d at p. 113.) In this case, Patient was under the care of physicians at the relevant times and those physicians had a duty to advise Patient about the dangers of driving. In our view, this responsibility loosens the connection between the conduct of the defendant entities and the injury suffered. It follows that little moral blame can attach to persons who rely on the physicians and do not issue a separate warning. Also, blurring the line between the responsibility of diagnosis and the responsibility for advising the patient would place burden on the medical community and create the possibility of contradictory and resulting confusion for patients or worse—opinion shopping by patients. Part of that burden for nonphysician providers would be putting them in the position of determining the point at which assessing a patient's ability to drive would constitute "diagnosing" the physical and mental condition of the person that is reserved to physicians by Business and Professions Code section 2052.

An example of a case recognizing a limit on the duties of a nurse is *Silves v. King* (Wash.App. 1999) 970 P.2d 790. There the court considered whether a discharge nurse had "an independent legal duty to undertake a personal review of [the discharge] instructions with each discharged patient." (*Id*. at p. 796.) In rejecting such a duty, the court stated: "The duty to ascertain and warn of material risks belongs to the physician. It is not ordinarily an independent duty of the nurse." (*Ibid*.)

Here, we conclude Pacific Hills and Focus Home Health did not have a separate and independent duty to warn Patient not to drive. Rather, they could rely on the physicians providing medical care to Patient. We have located, and plaintiff has cited, no case recognizing nonphysicians have such a duty to warn and, based on our analysis of the public policy factors, we will not adopt that novel theory.

25.

Consequently, we conclude the trial court properly granted the motion for judgment on the pleadings filed by Pacific Hills and Focus Home Health based on the absence of a legal duty to warn Patient not to drive. It follows that they did not have a legal duty to assess Patient's condition for purposes of determining whether a warning not to drive should have been given.

III.    STATUTORY DUTY TO REPORT

Plaintiff contends defendants had a duty to report Patient's condition and his inability to drive to the appropriate agencies. Plaintiff's appellate briefing refers to three statutes—Penal Code section 11165.7, Health and Safety Code section 1278.5, and Health and Safety Code section 103900 (section 103900). Here, we consider whether plaintiff has alleged a violation of a statute that could serve as the basis for invoking the evidentiary doctrine of negligence per se. (See Evid. Code, § 669, subd. (a); *Quiroz v. Seventh Ave. Center* (2006) 140 Cal.App.4th 1256, 1285–1286; CACI No. 418 [presumption of negligence per se].) When the conduct of a reasonable person in particular situations is prescribed by statute or ordinance, conduct that violates the statute or ordinance is negligence per se, or negligence as a matter of law. (6 Witkin, Summary of Cal. Law (11th ed. 2024) Torts, § 1002.)

First, Penal Code section 11165.7 is part of "the Child Abuse and Neglect Reporting Act." (Pen. Code, § 11164, subd. (a).) It defines the term " 'mandated reporter.' " (Pen. Code, § 11165.7, subd. (a)(1)–(49).) Besides mandating reporting of child abuse and neglect, the legislation strongly encourages public and private organizations to provide their employees who are mandated reporters training in both identifying and reporting "child abuse and neglect." (Pen. Code, § 11165.7, subd. (c)(1).) The Child Abuse and Neglect Reporting Act does not impose a duty on health care providers to report a patient with a condition that makes it dangerous for the patient to

drive. Thus, none of the misconduct alleged in the third amended complaint is sufficient to state a defendant violated a provision of the Child Abuse and Neglect Reporting Act.

Second, Health and Safety Code section 1278.5 is "the hospital whistleblower statute." (*Armin v. Riverside Community Hospital* (2016) 5 Cal.App.5th 810, 814.) The statute prohibits discrimination or retaliation by a health facility or an entity that owns a health facility against certain individuals, including patients, employees, members of the medical staff, or any other of the facility's health care workers. (*Brenner v. Universal Health Services of Rancho Springs, Inc.* (2017) 12 Cal.App.5th 589, 601–602.) The whistleblower statute does not require health facilities or doctors to report a patient who has a condition or is taking medication that makes driving dangerous. Therefore, plaintiff has failed to allege facts that, if proven, would establish defendants violated Health and Safety Code section 1278.5.

Third, Health and Safety Code section 103900, subdivision (a) provides in part: "Every physician and surgeon shall report immediately to the local health officer in writing, the name, date of birth, and address of every patient at least 14 years of age or older whom the physician and surgeon has diagnosed as having a case of a disorder characterized by lapses of consciousness." Local health officers are required to report the information to the Department of Motor Vehicles. (Health & Saf. Code, § 103900, subd. (b).) Initially, the plain meaning of the term "physician and surgeon" means that a skilled nursing facility and a home health agency are not statutorily required to report a patient under this provision. Therefore, plaintiff has not alleged Pacific Hills or Focus Home Health violated a provision of Health and Safety Code section 103900.

Plaintiff also has failed to allege facts showing Dr. Dhawan violated the mandatory reporting requirement because, despite having opportunities to amend, plaintiff has not alleged Dr. Dhawan diagnosed Patient as having "a disorder characterized by lapses of consciousness" and, alternatively, has not alleged the three regulatory elements of such a disorder. (Health & Saf. Code, § 103900, subd. (a).) The

phrase "disorders characterized by lapses of consciousness" is defined by regulation as "those medical conditions that involve: (1) a loss of consciousness or a marked reduction of alertness or responsiveness to external stimuli; and (2) the inability to perform one or more activities of daily living; and (3) the impairment of the sensory motor functions used to operate a motor vehicle." (Cal. Code Regs., tit. 17, § 2806, subd. (a).)

Health and Safety Code section 103900, subdivision (a) also provides that, "if a physician and surgeon reasonably and in good faith believes that the reporting of a patient will serve the public interest, he or she may report a patient's condition even if it may not be required under the department's definition of disorders characterized by lapses of consciousness pursuant to subdivision (d)." (Health & Saf. Code, § 103900, subd. (a).) Because this type of reporting is discretionary, plaintiff cannot allege Dr. Dhawan violated this provision.

To summarize, plaintiff has not alleged facts establishing any defendant violated a statute. Therefore, plaintiff cannot rely on the doctrine of negligence per se to establish a breach of a standard of care. (See Evid. Code, 669.)

IV. ALLEGING CAUSATION

Appellate courts will affirm a judgment if it is proper on any grounds raised in the motion for judgment on the pleadings, even if the trial court did not rely on those grounds. (*Pang v. Beverly Hospital, Inc.*, *supra*, 79 Cal.App.4th at p. 989.) Under this rule, we consider the alternate ground raised by Dr. Dhawan's motion—namely, did plaintiff fail to show any of Dr. Dhawan's alleged wrongdoing was a proximate cause of her injuries. The trial court rejected this ground, concluding causation had been sufficiently alleged. Under the applicable standard of review, the trial court's determination receives no deference because we are required to conduct an independent review and reach our own legal conclusion about whether causation is sufficiently alleged. (See pt. I., *ante*.)

28.

Dr. Dhawan's appellate brief frames the issue as follows: "Do the facts sufficiently plead causation as to Dr. Dhawan when the [third amended complaint] speculates about what may have caused [Patient's] reckless driving and where [Patient] was driving with a suspended license at the time of the accident?"

A.      Pleading Specific Facts to Show Causation

Contrary to speculating about the matter of causation, the third amended complaint alleged the breach of the applicable standard of care by each defendant "was a proximate cause of the resulting injury to" plaintiff. From Dr. Dhawan's view, this allegation lacks facts showing Dr. Dhawan's acts or omission were more likely than not the cause of her injuries and the mere possibility alone is insufficient to establish a prima facie case. The opinions cited by Dr. Dhawan to support this argument involve the grant of nonsuit, not the grant of a motion for judgment on the pleadings or an order sustaining a demurrer. (See *Bromme v. Pavitt* (1992) 5 Cal.App.4th 1487 [grant of partial nonsuit affirmed]; *Jones v. Ortho Pharmaceutical Corp.* (1985) 163 Cal.App.3d 396 [nonsuit granted and affirmed because evidence was insufficient to show connection between development or aggravation of cancerous condition and use of the suspected drug].) Consequently, those cases had no reason to address how to adequately plead the element of causation.

In *Guilliams v. Hollywood Hospital* (1941) 18 Cal.2d 97, the court concluded causation had been sufficiently alleged, stating: "The complaint, in a number of subsequent paragraphs, alleges that as an immediate and proximate result of the concurrent acts of negligence of the defendants, plaintiff suffered pain, loss of health and delayed recuperation, and was thereby damaged in the sum of $25,000. The allegations of proximate cause are in the usual form, and are sufficient." (*Id*. at p. 103.) In other words, California law ordinarily regards causation as an ultimate fact that may be generally rather than specifically pleaded. (See *Dominguez v. Pantalone* (1989) 212 Cal.App.3d 201, 208 [causation is an ultimate fact].)

29.

Examples of how to generally plead the ultimate fact of causation are provided by Judicial Council forms. Item MV-1 in Judicial Council form PLD-PI-001(1), Cause of Action—Motor Vehicle, provides: "Plaintiff alleges the acts of defendants were negligent; the acts were the legal (proximate) cause of injuries and damages to plaintiff; the acts occurred on (*date*): … at (*place*): …." Item GN-1 in Judicial Council form PLD-PI-001(2), Cause of Action—General Negligence, states: "Plaintiff … alleges that defendant … was the legal (proximate) cause of damages to plaintiff. By the following acts or omissions to act, defendant negligently caused the damage to plaintiff[.]" This language is followed by blanks for the date, place, and a description of the reasons for liability.[10] Accordingly, plaintiffs typically are not required to specifically allege facts explaining how the negligent conduct was a substantial factor in causing the harm—that is, "a factor that a reasonable person would consider to have contributed to the harm." (CACI No. 430 [causation: substantial factor test]; see *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 968 [the substantial factor test is used by triers of fact to determine whether a wrongful act or omission proximately caused an injury].)

Consistent with the rule of pleading that recognizes causation as an ultimate fact that can be alleged in general terms, our Supreme Court has stated that proximate cause *usually* is a question of fact that cannot be decided as a matter of law from the allegations of a complaint. (*State Dept. of State Hospitals v. Superior Court* (2015) 61 Cal.4th 339, 353 (*State Hospitals*).) However, the court also recognized that causation could be decided from the allegations of a complaint in some cases, stating " 'where the facts are

---

**10** We note that the Judicial Council's resolution of a question of law, such as how causation is pleaded, is not binding on the courts but can be highly persuasive. (See e.g., *In re M.B.* (2011) 201 Cal.App.4th 1057, 1063; see also, *Perez v. Golden Empire Transit Dist.* (2012) 209 Cal.App.4th 1228, 1237 [consistent with Judicial Council pleading forms, "plaintiff may allege compliance with the claims presentation requirement in the Government Claims Act by including a general allegation that he or she timely complied with the claims statute"].)

such that the only reasonable conclusion is an absence of causation, the question is one of law, not of fact.' " (*State Hospitals*, *supra*, 61 Cal.4th at p. 353.)

In *State Hospitals*, a woman whose 15-year-old sister was murdered by a recently paroled prisoner sued the State Department of Mental Health (DMH) and two of its acting directors for failing to discharge mandatory duties imposed by the Sexually Violent Predators Act (SVPA). (*State Hospitals*, *supra*, 61 Cal.4th at pp. 343–344.) The SVPA authorizes the involuntary civil commitment of persons deemed to be sexually violent predators after they have completed their prison term. (*Id*. at p. 344.) The Department of Corrections' initial assessment of the prisoner determined he was likely to be a sexually violent predator. He was referred to the DMH for a full evaluation. The statute requires the DMH's evaluation be performed by two psychiatrists, two psychologists, or one of each. The prisoner saw only one evaluator, who determined he was suitable for release. Days after his release, the prisoner raped and murdered the plaintiff's sister. The plaintiff's theory that the DMH's negligence caused her sister's death was based on the allegation that the prisoner would have been civilly committed had he been seen by two evaluators as required by the SVPA. (*Id*. at pp. 346-347.) The DMH filed a demurrer, which the trial court overruled. (*Id*. at p. 344.) The court of appeal issued an order to show cause, concluding the breach of the mandatory duty was not the proximate cause of the sister's death. (*Ibid*.) The Supreme Court affirmed, stating the "plaintiff could not establish that the alleged breach of this duty was a proximate cause of [her sister's] death." (*Id*. at p. 357.)

The court found as a matter of law that the DMH's alleged breach was not the proximate cause of the sister's death because the chain of causation included too many discretionary decisions before the prisoner would have been committed under the SVPA. (*State Hospitals*, *supra*, 61 Cal.4th at pp. 355-356.) Had a second evaluation been done as required, that evaluator would have needed to reach the opposite conclusion of the first evaluator and find the inmate was a sexually violent predator. In that scenario, the

31.

inmate would have been examined next by two different professionals. Only if they both agreed that the inmate was a sexually violent predator would a request be made to the county's counsel to file petition for commitment. If counsel agreed with the request, it would file a petition in the superior court. The court would then evaluate the petition for probable cause. If the court found there was no probable cause, the petition would be dismissed. Alternatively, if it found probable cause, the last step required a jury to determine beyond a reasonable doubt that the inmate was a sexually violent predator. (*Id*. at pp. 344-346, 355-356.) The court concluded the allegations of cause in fact were "conjectural, depending on a long series of determinations that would have been required after DMH's breach in order for the injury to have been prevented." (*Id*. at p. 357.)

Here, there is no long series of discretionary determinations or other events that must have occurred to prevent the accident. Plaintiff's theory of causation is straightforward—if Patient had been given a proper warning not to drive while using the medications, he would not have been driving on Millerton Road on the day of the accident and, therefore, would not have collided with plaintiff. Based on the relatively few links in this causal chain of events, we conclude the issue of causation falls into the usual category and is a question of fact that cannot be resolved against the plaintiff at the pleading stage. Also, we cannot determine whether the medical advice provided by physicians providing medical care to Patient after Dr. Dhawan prescribed the medication acted as a superseding cause that broke the causal chain between Dr. Dhawan's failure to warn of the medications' dangers and Patient's decision to drive his truck the day of the accident. (See *Brewer v. Teano* (1995) 40 Cal.App.4th 1024, 1031, [superseding cause breaking the chain of causation].) In short, the allegations do not establish "the only reasonable conclusion is an absence of causation." (*State Hospitals*, *supra*, 61 Cal.4th at p. 353.)

32.

Therefore, the grant of Dr. Dhawan's motion for judgment on the pleadings cannot be upheld based on a failure to sufficiently connect the breach of the duty to warn with the injury.

## DISPOSITION

The judgment in favor Dr. Dhawan, filed August 15, 2023, is reversed and the order granting her motion for judgment on the pleadings is vacated. The judgment in favor of Pacific Hills and Focus Home Health, filed August 18, 2023, is affirmed. In the interest of justice, the parties shall bear their own costs on appeal.


FRANSON, J.

WE CONCUR:


HILL, P. J.


MEEHAN, J.